NEW ENGLAND REHABILITATION HOSPITAL OF HART-FORD, INC., ET AL. *v.* COMMISSION ON HOSPITALS AND HEALTH CARE ET AL.
(14586)
(14617)

BORDEN, BERDON, KATZ, F. X. HENNESSY and BARALL, Js.

Argued February 10—decision released June 22, 1993

*Elliott B. Pollack,* with whom were *Michael Kurs* and, on the brief, *Mary Alice Leonhardt,* for the appellants (plaintiffs).

*Patricia A. Gerner,* assistant attorney general, with whom were *Thomas J. Ring,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, and *Richard J. Lynch,* assistant attorney general, for the appellee (named defendant).

*Bourke G. Spellacy,* with whom were *Carol S. Clapp* and, on the brief, *Karen A. Keefe,* for the appellees (defendant Hartford Rehabilitation Hospital, Inc., et al.).

KATZ, J. The principal issues in these appeals are: (1) whether the trial court correctly concluded that the plaintiffs, a consortium of health care providers, were not aggrieved by the decision of the defendant commission on hospitals and health care (CHHC) granting the application of the other defendants (defendants), a separate consortium of health care providers, to develop, construct and operate a rehabilitation facility; and (2) whether the trial court correctly concluded that CHHC properly conducted an independent investigation pursuant to General Statutes § 19a-149. These appeals arise from two separate actions: *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care* (Docket No. 14586),

and *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care* (Docket No. 14617). In the first case, the plaintiffs, the New England Rehabilitation Hospital of Hartford, Inc. (NERHH),[1] Hartford Hospital, The Institute of Living and AdvantageHealth Corporation, appeal from the judgment of the trial court dismissing their appeal from the decision of CHHC granting permission to the defendants, Central Connecticut Rehabilitation Hospital, Inc. (CCRH),[2] Saint Francis Hospital and Medical Center, the Mount Sinai Hospital Corporation and the Hartford Rehabilitation Hospital, Inc., to build and operate a rehabilitation hospital in Hartford. In the second case, the plaintiffs appeal from the judgment of the trial court dismissing their appeal from the decision of CHHC denying them permission to build and operate a rehabilitation hospital in Hartford. Because both applications were heard together by CHHC and because the underlying facts are similar, we consider them in one opinion.

The following facts, as set forth in CHHC's rulings and in the trial court opinions, are undisputed. On October 10, 1990, the defendants filed a letter of intent to apply for a certificate of need to develop, construct and operate a rehabilitation facility in Hartford. On November 26, 1990, the plaintiffs filed a letter of intent to apply for a certificate of need to develop, construct and operate a rehabilitation hospital in Hartford. Pursuant to General Statutes (Rev. to 1991) §§ 19a-154 and 19a-155,[3] the plaintiffs submitted a certificate of need

---

[1] The ownership of NERHH is composed of Hartford Hospital, The Institute of Living and AdvantageHealth Corporation of Woburn, Massachusetts. Each of these entities is a coapplicant to the NERHH application.

[2] CCRH is owned by Saint Francis Hospital and Medical Center, the Mount Sinai Hospital Corporation and the Hartford Rehabilitation Hospital, Inc. Each of these entities is a coapplicant to the CCRH application.

[3] General Statutes (Rev. to 1991) § 19a-154 (a) provides: "Any health care facility or institution, as defined in subsection (a) of section 19a-490, except

application to CHHC on January 18, 1991, to develop, construct and operate a ninety bed comprehensive medical rehabilitation hospital on the grounds of The Institute of Living in Hartford, at a capital expenditure of $13,350,000. The defendants submitted a certificate of need application to CHHC on May 20, 1991, to develop, construct and operate an eighty bed comprehensive medical rehabilitation hospital at the former site of the Hebrew Home and Hospital in Hartford, at a capital

a home health care agency or homemaker-home health aide agency, which intends to transfer all or any part of its ownership or control prior to being initially licensed, any inpatient rehabilitation facility affiliated with the Easter Seal Society of Connecticut, Inc., any health care facility or institution or any state health care facility or institution, except a home health care agency, homemaker-home health aide agency, which intends to introduce any additional function or service into its program of health care, except a program of ambulatory services established and conducted by a health maintenance organization, any health care facility or institution or any state health care facility or institution which intends to terminate a health service offered by such facility or institution or decrease substantially its total bed capacity, shall prior to the proposed date of such transfer or of institution of such function or service or increase in staff and in accordance with the schedule established by the commission pursuant to subsection (b) of this section, submit to the commission a request for permission to undertake such function or service or increase its staff. The commission shall make such review of the proposal as it deems necessary, including, in the case of a proposed transfer of ownership or control prior to initial licensure, such factors as, but not limited to, the financial responsibility and business interests of the transferee and the ability of the institution to continue to provide needed services, in the case of the introduction of an additional function or service, ascertaining the availability of such service or function at other inpatient rehabilitation facilities, health care facilities or institutions or state health care facilities or institutions within the area to be served, the need for such service or function within such area and any other factors which the commission deems relevant to a determination of whether the facility or institution is justified in introducing such additional functions or services into its program or increasing its staff. The commission shall grant, modify or deny such request within ninety days of the receipt thereof, except as provided for in this section. Upon the request of the applicant, the review period may be extended for an additional fifteen days if the commission has requested additional information subsequent to the commencement of the commission's review period. Upon the vote of the commission, the review period may be extended for a maximum of thirty days if the applicant has not filed in a timely manner, infor-

expenditure of $17,290,627. Both the plaintiffs' and the defendants' applications were deemed complete by CHHC on July 18, 1991. The plaintiffs' application was assigned Docket No. 91-906 and the defendants' application was assigned Docket No. 91-917. Additionally, R.H.S.C. Hospital, Inc. (RHSC), submitted a certificate of need application to CHHC to develop, construct and operate a sixty bed rehabilitation hospital at a capital expenditure of $13,827,000, and was assigned Docket No. 91-901.

mation deemed necessary by the commission. Failure of the commission to act on such request within such review period shall be deemed approval thereof, except that if the failure to act results from a tie vote of the commission on a motion to approve, modify or deny the request, the review period shall automatically be extended fifteen days. Upon a showing by such facility or institution that the need for such function or service or increase in staff is of an emergency nature, the commission may waive the requirement that the request for such permission be submitted, in accordance with the schedule established by the commission pursuant to subsection (b) of this section, provided such request shall be submitted at least ten days before the proposed date of institution of the function or service."

General Statutes (Rev. to 1991) § 19a-155 (a) provides: "Except for a program of ambulatory services established and conducted by a health maintenance organization, any inpatient rehabilitation facility affiliated with the Easter Seal Society of Connecticut, Inc., any health care facility or institution except a home health care agency or homemaker-home health aide agency or any state health care facility or institution proposing a capital expenditure exceeding one million dollars, or the acquisition of major medical equipment requiring a capital expenditure, as defined in regulations adopted pursuant to section 19a-160, in excess of four hundred thousand dollars, including the leasing of equipment or a facility, which expenditure was not included in a budget approved or revenue caps established under section 19a-156 or sections 19a-167 to 19a-167g, inclusive, shall submit a request for approval of such expenditure to the commission, with such data, information and plans as the commission requires in advance of the proposed initiation date of such project and in accordance with the schedule established by the commission pursuant to subsection (c) of this section. The commission shall thereupon hold a public hearing with respect to such request, at least two weeks' notice of which shall be given to the facility or institution by certified mail and to the public by publication in a newspaper having a substantial circulation in the area served by the facility or institution. Such hearing shall be held at the discretion of the commission in Hartford or in the area so served. The commission shall consider such request in rela-

On January 29, 1991, after the plaintiffs had filed their certificate of need application, but before the defendants had filed their application, CHHC adopted a resolution stating that it was going to conduct an investigation pursuant to General Statutes § 19a-149[4]

tion to the community or regional need for such capital program or purchase of land, the possible effect on the operating costs of the health care facility or institution, and such other relevant factors as the commission deems necessary. In approving or modifying such request, the commission may not prescribe any condition, such as but not limited to any condition or limitation on the indebtedness of the facility or institution in connection with a bond issue, the principal amount of any bond issue or any other details or particulars related to the financing of such capital expenditure, not directly related to the scope of such capital program and within control of the facility or institution. Upon a showing by such facility or institution that the need for such capital program is of an emergency nature, the commission may waive the requirement that the request be submitted in accordance with the schedule established by the commission pursuant to subsection (c) of this section and that a public hearing be held thereon, provided such request shall be submitted at least ten days before the proposed initiation date of the project. The commission shall grant, modify or deny such request within ninety days or within ten days, as the case may be, of receipt thereof, except as provided for in this section. Upon the request of the applicant, the review period may be extended for an additional fifteen days if the commission has requested additional information subsequent to the commencement of the commission's review period. Upon the vote of the commission, the review period may be extended for a maximum of thirty days if the applicant has not filed in a timely manner, information deemed necessary by the commission. Failure of the commission to act thereon within such review period shall be deemed approval of such request, except that if the failure to act results from a tie vote of the commission on a motion to approve, modify or deny the request, the review period shall automatically be extended fifteen days. The commission shall, not later than January 1, 1981, adopt regulations to establish an expedited hearing process to be used to review requests by any facility or institution for approval of a capital expenditure to establish an energy conservation program or to comply with requirements of any federal, state or local health, fire, building or life safety code. The commission shall adopt regulations in accordance with the provisions of chapter 54 to provide for the waiver of a hearing, for any part of a request by a facility or institution for a capital expenditure, provided such facility or institution and the commission agree upon such waiver."

[4] General Statutes § 19a-149 provides: "INVESTIGATIVE POWERS. The commission, or any member thereof, or any agent authorized by the commission to conduct any inquiry, investigation or hearing under the provisions of this chapter, shall have power to administer oaths and take testimony

"to determine the availability, efficacy, and cost-effectiveness of rehabilitation services in Connecticut acute care hospitals, skilled nursing facilities, specialty hospitals, and other settings where these services may be offered." The resolution stated that CHHC was aware of at least six proposals that would be submitted to introduce rehabilitation services and that "in order to carry out its duties pursuant to [General Statutes] § 19a-153," CHHC needed information that was not then available to it. The CHHC assigned Docket No. 91-100RES to this investigation.

As part of its investigation, CHHC sent questionnaires to rehabilitation physicians and psychiatrists, inpatient and outpatient providers of interdisciplinary rehabilitation services, and acute care hospital discharge planners in Connecticut. CHHC also invited those same people to attend an investigatory proceeding at its offices on February 28, 1991, to testify as to the present status of rehabilitation services in Connecticut. CHHC instructed that "[n]o testimony concerning the specific proposals for any rehabilitation service [certificates of need] filed or expected to be filed with [CHHC] will be received at this proceeding." John J. Farrell, a CHHC commissioner, conducted the investigation.

under oath relative to the matter of inquiry or investigation. At any hearing ordered by the commission, the commission or such agent having authority by law to issue such process may subpoena witnesses and require the production of records, papers and documents pertinent to such inquiry. If any person disobeys such process or, having appeared in obedience thereto, refuses to answer any pertinent question put to him by the commission or its authorized agent or to produce any records and papers pursuant thereto, the commission or its agent may apply to the superior court for the judicial district of Hartford-New Britain or for the judicial district wherein the person resides or wherein the business has been conducted, or to any judge of said court if the same is not in session, setting forth such disobedience to process or refusal to answer, and said court or such judge shall cite such person to appear before said court or such judge to answer such question or to produce such records and papers."

The plaintiffs filed an application for party status in the investigation, Docket No. 91-100RES, on February 22, 1991, which CHHC subsequently denied. As part of its investigation, CHHC held a public hearing on February 28, 1991, at which a series of speakers testified, including representatives of Hartford Hospital as well as two other speakers who were later witnesses on behalf of AdvantageHealth Corporation at a contested proceeding on the plaintiffs' application on August 21, 1991. Participants in the investigation were permitted to comment in writing to CHHC at various stages before CHHC issued its report. Participants, however, were not allowed to cross-examine others who appeared before CHHC,[5] and none of the participants in this investigatory hearing were designated as parties. On May 1, 1991, CHHC issued an investigative report.

Thereafter, on August 2, 1991, CHHC published in the Hartford Courant legal notice that CHHC was to hold a joint public hearing on all three applications.[6] Following RHSC's withdrawal of its certificate of need application,[7] Docket Nos. 91-917 and 91-906 "were consolidated for purposes of hearing," which CHHC held on August 20, 21, 22 and September 12, 1991, before Farrell. Other commission members in attendance as observers were Steven J. Bongard, Donald G. Reed and Mary T. Collier. The hearing was conducted as a "contested case" pursuant to §§ 19a-154 and 19a-155 and

[5] The plaintiffs sought to cross-examine witnesses during this hearing, but CHHC denied their request.

[6] General Statutes (Rev. to 1991) §§ 19a-154 and 19a-155 require CHHC to conduct a hearing on any certificate of need application proposing a capital expenditure of over one million dollars. See footnote 3. The notice stated that "[p]ursuant to Sections 19a-154 and 155 of the Connecticut General Statutes, the Commission on Hospitals and Health Care will hold a joint public hearing to hear testimony on the requests of the following facilities . . . . The applicants are designated as parties to this proceeding. . . ."

[7] On August 5, 1991, RHSC withdrew its certificate of need application and was subsequently granted intervenor status.

in accordance with the Uniform Administrative Procedure Act (UAPA). General Statutes §§ 4-166 through 4-189.

In addition to the evidence presented by the plaintiffs and the defendants, CHHC introduced its investigative report into the record of both cases: the plaintiffs' Docket No. 91-906 and the defendants' Docket No. 91-917. At the joint hearing, CHHC also heard testimony from a number of witnesses subpoenaed by it, intervenors[8] and interested persons. CHHC reviewed community and regional need, cost-effectiveness and utilization, financial feasibility, quality and accessibility, teaching and research responsibilities, efforts to improve productivity and contain costs, managerial competency and technical expertise and the impact of the proposals on consumers and payers of health care.

In response to questions regarding the defendants' certificate of need application and CHHC's questioning at the hearing, the defendants submitted alternatives to their initial proposal of a newly constructed freestanding rehabilitation hospital. The defendants' "Scheme A" proposed an eighty bed facility comprised of the existing medical office building on the campus of Mount Sinai Hospital and new construction of a two story building for a capital cost of $14,344,902, without capitalized financing costs. "Scheme A-60" proposed the same basic facility as Scheme A with twenty fewer general rehabilitation beds costing $13,944,902, without capitalized financing costs. "Scheme B" proposed an eighty bed facility comprised of new construction on level three (the ground level of Mount Sinai Hospital) and renovation of what is level four of Mount Sinai Hospital, for a capital cost of $13,244,902, with-

---

[8] CHHC granted intervenor status to RHSC, Gaylord Hospital, Inc., and New Britain Memorial Hospital.

out capitalized financing costs. "Scheme B-60" proposed the same basic facility as Scheme B with twenty fewer beds, for a capital cost of $12,894,902, without capitalized financing costs. All of the above alternatives included costs for the demolition and removal of the Hebrew Home and Hospital. CHHC found each of these alternatives to be comparable to the defendants' initial application.

The plaintiffs did not submit alternative schemes in response to the certificate of need application questions, and instead indicated that no alternative had been considered to the proposal submitted. In response to CHHC questioning, the plaintiffs thereafter submitted descriptions of reduced bed alternatives: (1) a sixty bed freestanding hospital on the campus of the Institute of Living at a capital cost of $7,674,320; (2) a sixty bed facility on the second floor of one of the buildings already in existence on the campus of the Institute of Living, at a capital cost of $2,320,167; and (3) a forty bed facility in an existing building on the Hartford Hospital campus at a capital cost of $2,030,000. The plaintiffs considered the second alternative to be the most attractive and viable. CHHC, however, found that the plaintiffs' second alternative was not comparable in program scope to the initial application. It further found that this alternative would have no patient dining room, no space for a therapeutic pool program and no separate identity from the psychiatric hospital on whose grounds the rehabilitation hospital would operate.

On November 25, 1991, CHHC issued its final decision in Docket No. 91-917, unanimously approving the defendants' certificate of need application as amended.

On that same day, CHHC issued its final decision in Docket No. 91-906, unanimously denying the plaintiffs' certificate of need application. CHHC found that although the plaintiffs' and the defendants' original

applications were quite similar in scope, the alternative proposals were not. The certificate of need granted to the defendants was for a sixty bed facility that will have a capital cost of $13,670,265 and will add no new beds to the system. Because the defendants' final proposal included shutting down the twenty-four bed rehabilitation unit at Mount Sinai Hospital, and also eliminating the nine rehabilitation beds currently in service at Saint Francis Hospital and Medical Center, CHHC found that an annual cost savings of $3,214,797 to consumers and payers of health care services would be realized.

Pursuant to General Statutes § 4-183 of the UAPA and § 19a-158,[9] the plaintiffs appealed to the trial court from the final decision on their own application; *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV-92-506106 (July 20, 1992); as well as from the decision granting the defendants' application; *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV-92-506105 (April 6, 1992). In

[9] General Statutes § 4-183 provides in pertinent part: "(a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the superior court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal."

General Statutes § 19a-158 provides: "Any health care facility or institution and any state health care facility or institution aggrieved by any final decision of said commission under the provisions of sections 19a-145 to 19a-156, inclusive, or sections 19a-167 to 19a-167g, inclusive, may appeal therefrom in accordance with the provisions of section 4-183, except venue shall be in the judicial district in which it is located. Such appeal shall have precedence in respect to order of trial over all other cases except writs of habeas corpus, actions brought by or on behalf of the state, including informations on the relation of private individuals, and appeals from awards or decisions of workers' compensation commissioners."

the former complaint, the plaintiffs alleged that CHHC, by conducting its own investigation pertaining to the availability, quality, efficiency and cost-effectiveness of rehabilitation services in Connecticut, in effect had conducted a contested case, thereby denying the plaintiffs participation therein in violation of the procedures established by the UAPA. The plaintiffs claimed that this conduct constituted an ex parte communication that was presumptively prejudicial and thereby invalidated CHHC's decision denying their certificate of need application.

The trial court dismissed the plaintiffs' appeal, thus affirming CHHC's denial of the plaintiffs' application. *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care,* 42 Conn. Sup. 413, 622 A.2d 1067 (1992). In its memorandum of decision, the court first observed that § 19a-149 does not contain any "prohibition against a general investigation because of the pendency of an application to build a particular proposed facility and the statute contains no requirement that the parties to a pending application be made parties in a general investigation by [CHHC]." Id., 418–19. The trial court concluded that the general investigation held by CHHC pursuant to § 19a-149 did not constitute a contested case and thus CHHC had not violated the procedures required by the UAPA in contested cases. Although General Statutes § 4-178 (5) expressly provides for the right to cross-examine witnesses in contested hearings conducted by agencies, the trial court reasoned that general investigations pursuant to § 19a-149 are not contested cases as defined in General Statutes § 4-166 (2).[10] Id., 419.

[10] General Statutes § 4-166 (2) provides: " 'Contested case' means a proceeding, including but not restricted to rate-making, price fixing and licensing, in which the legal rights, duties or privileges of a party are required by statute to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held, but does not include proceedings on a petition for a declaratory ruling under section 4-176 or hearings referred to in section 4-168."

The trial court further concluded that there was no indication that the plaintiffs had been prevented from calling any of the witnesses from the investigative hearing to testify. Id. Farrell, the hearing officer, stated at the contested hearing that the plaintiffs could address any deficiencies they found in the investigative report. Id. The trial court concluded, therefore, that the plaintiffs failed to support their claim that "they were denied the opportunity to offer full advocacy as to the need for a facility in the proceedings as to their application." Id., 420.

In their appeal from the decision granting the defendants' application, the plaintiffs alleged that the decision to approve the defendants' application in Docket No. 91-917 had been arbitrary, illegal and an abuse of discretion. The plaintiffs claimed that CHHC's approval of the defendants' application had exceeded CHHC's statutory authority and was erroneous in light of the reliable, probative and substantial evidence in the record. The plaintiffs additionally alleged that CHHC's decision had been arbitrary and an abuse of discretion because "[CHHC had been] critical of [the plaintiffs], but not of [the defendants], on issues where the respective applications were substantially similar." The plaintiffs' allegations distilled to the claim that CHHC had "relied on substantially the same evidence to reach inconsistent decisions in granting [the defendants'] application while denying [the plaintiffs'] application."

The defendants thereafter filed a motion to dismiss the plaintiffs' appeal of CHHC's approval of the defendants' certificate of need application on the grounds that the plaintiffs were not aggrieved by the granting of the defendants' application and thus did not have standing to appeal that decision. At the hearing on the motion, the only evidence offered to support the plaintiffs' claim of aggrievement was the affidavits that had been appended to the plaintiffs' memorandum in oppo-

sition to the defendants' motion. In its decision dismissing the plaintiffs' complaint, the trial court ruled that the plaintiffs' allegations of loss of opportunity to provide a service and gain revenues contained within these affidavits were insufficient to substantiate their claim that they had a specific personal and legal interest in the subject matter of CHHC's decision to approve the defendants' certificate of need application. Because the plaintiffs failed to meet the first prong of the aggrievement test, they had no standing to appeal the decision. Following reargument of the motion to dismiss, the court maintained its earlier decision that the plaintiffs had failed to present any evidence to establish aggrievement[11] and reaffirmed the judgment of dismissal.

The plaintiffs thereafter filed separate appeals to the Appellate Court and we transferred both appeals to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). In their appeal from the judgment of the trial court dismissing their challenge to the granting of the defendants' certificate of need, the plaintiffs raise the sole claim that the trial court incorrectly determined that they were not aggrieved and improperly dismissed their appeal. In their appeal from the judgment of the trial court affirming the denial of their own certificate of need, the plaintiffs claim that the trial court failed to recognize that by incorporating its own investigative report, based on information gathered in Docket No. 91-100RES, CHHC used its investigative docket in a manner that curtailed the plaintiffs' rights to participate in the presentation of evidence concerning their application. We disagree with the plaintiffs' claims in both appeals.

---

[11] In a supplemental decision, the court corrected its earlier decision to reflect the fact that the plaintiffs had been designated as a party at CHHC's joint public hearing. This did not alter the court's conclusion that the plaintiffs had not proved aggrievement.

## I

It is well established that the right to appeal an administrative action is created only by statute and a party must exercise that right in accordance with the statute in order for the court to have jurisdiction. *Munhall* v. *Inland Wetlands Commission,* 221 Conn. 46, 50, 602 A.2d 566 (1992). In this case, the plaintiffs appealed pursuant to General Statutes §§ 19a-158 and 4-183a. Section § 19a-158, which is the specific statutory authority permitting the appeal of a CHHC decision, states in pertinent part: "Any health care facility or institution and any state health care facility or institution aggrieved by any final decision of said commission under the provisions of sections 19a-145 to 19a-156, inclusive . . . may appeal therefrom in accordance with the provisions of section 4-183 . . . ." Section 4-183 (a) provides in pertinent part: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the superior court as provided in this section."

Accordingly, in order to have standing to bring an administrative appeal, a person or entity must be aggrieved. *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care,* 214 Conn. 726, 729, 573 A.2d 736 (1990); *Zoning Board of Appeals* v. *Freedom of Information Commission,* 198 Conn. 498, 501, 503 A.2d 1161 (1986). Aggrievement is a question of fact for the trial court and the plaintiff has the burden of proving that fact. *Olsen* v. *Inland Wetlands Commission,* 6 Conn. App. 715, 718, 507 A.2d 495 (1986). Pleading and proof of facts that constitute aggrievement are essential prerequisites to the trial court's subject matter jurisdiction over an administrative appeal. *Park City Hospital* v. *Commission on Hospitals & Health Care,* 210 Conn. 697, 702, 556 A.2d 602 (1989); *Olsen* v. *Inland Wetlands Commission,* supra; *Ribicoff*

v. *Division of Public Utility Control,* 38 Conn. Sup. 24, 26–27, 445 A.2d 325 (1980), aff'd, 187 Conn. 247, 445 A.2d 324 (1982). In the absence of aggrievement, an administrative appeal must be dismissed for lack of subject matter jurisdiction. *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care,* supra, 729–30; *Local 1303 & Local 1378* v. *Freedom of Information Commission,* 191 Conn. 173, 177, 463 A.2d 613 (1983).

The test for determining aggrievement is a two part inquiry: "[F]irst, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision. . . ." (Internal quotation marks omitted.) *Cannavo Enterprises, Inc.* v. *Burns,* 194 Conn. 43, 47, 478 A.2d 601 (1984); *State Medical Society* v. *Board of Examiners in Podiatry,* 203 Conn. 295, 299–300, 524 A.2d 636 (1987); *Bakelaar* v. *West Haven,* 193 Conn. 59, 65, 475 A.2d 283 (1984). The defendants argue that the plaintiffs failed to allege and prove the infringement of any legally protected interest in the subject matter of CHHC's decision to approve the defendants' certificate of need application and that the plaintiffs, therefore, failed to demonstrate aggrievement. We agree.

A

In its attempt to establish aggrievement, the plaintiffs submitted three affidavits with their memorandum of law in opposition to the defendants' motion to dismiss. These affidavits, collectively, asserted that: (1) approval of the defendants' certificate of need appli-

cation adversely affected the economic value of
NERHH; (2) the plaintiffs "will lose the opportunity
to gain the revenues, profits, diversification of services,
improvement of their respective competitive positions
in the health care marketplace and the overall growth
which they otherwise [would] have gained"; (3) the exis-
tence of additional certificates of need cause a dilution
and diminution in value of each certificate of need for
a similar service; and (4) The Institute of Living would
"lose the opportunity to gain the revenues, profits and
improvement of their competitive position in the health
care marketplace" and The Institute "will be further
harmed as it will be prevented from diversifying its pro-
grams and from instituting a campus reutilization pro-
gram . . . . " Additionally, the plaintiffs have alleged
that certain findings and conclusions in CHHC's deci-
sion granting the defendants' application, which are
also contained in CHHC's decision denying the plain-
tiffs' application, will become res judicata as to the
appeal from that decision. Finally, the plaintiffs alleged
in their complaint that their application had been denied
because the defendants' application had been approved.
That approval, according to the plaintiffs, was "ille-
gal" and "unfair."

It was the function of the trial court to determine,
first, whether the plaintiffs' allegations, if proved,
would constitute aggrievement as a matter of law, and
second, whether the plaintiffs had proved the truth of
those allegations. *Nader* v. *Altermatt,* 166 Conn. 43,
51, 347 A.2d 89 (1974). Because we conclude that the
trial court correctly determined that the plaintiffs' alle-
gations, if proved, do not constitute aggrievement as
a matter of law, we do not reach the second question.

The party claiming aggrievement from a decision
directed to another person or entity must establish the
certainty of a "specific personal and legal interest in

the subject matter of the decision . . . ."[12] (Internal quotation marks omitted.) *Cannavo Enterprises, Inc.* v. *Burns,* supra, 47. In *State Medical Society* v. *Board of Examiners in Podiatry,* supra, 300, we found that a *licensed* physician specializing in orthopedics had a " 'right and estate in his profession' " to appeal from a declaratory ruling of the board of examiners in podiatry that involved the practice of orthopedic medicine. "Cases are legion holding, in one way or another, that the right of a licentiate to practice his profession is a property right, or a right in the nature of a property right, or a valuable franchise, or a valuable privilege." (Internal quotation marks omitted.) Id. Similarly, we have held that an attorney at law, admitted to practice, has a franchise regarded as a property right. *In re Application of Pagano,* 207 Conn. 336, 341, 541 A.2d 104 (1988).

In *Kelly* v. *Freedom of Information Commission,* 221 Conn. 300, 603 A.2d 1131 (1992), the plaintiff chief state's attorney was denied party status in a freedom of information commission (FOIC) proceeding. A newspaper editor had filed a complaint after the Windsor Locks chief of police refused to disclose publicly a police report concerning the arrest of two individuals. After the FOIC ordered the police department to release the report, the plaintiff appealed to the trial court, which dismissed the appeal because it found no aggrievement. We reversed the trial court's judgment, concluding that the plaintiff, who is the person responsible for the investigation and prosecution of criminal cases in Connecticut, was aggrieved because of the impact that the FOIC's order would have on the prosecution of cases

---

[12] This is in contrast to the second prong of the aggrievement test that requires only a possibility, as distinguished from a certainty, that some legally protected interest has been adversely affected. *Rose* v. *Freedom of Information Commission,* 221 Conn. 217, 230, 602 A.2d 1019 (1992); *Hall* v. *Planning Commission,* 181 Conn. 442, 445, 435 A.2d 975 (1980).

for which he bears statutory responsibility. Id., 312. We held that "the plaintiff has demonstrated that his *present* interest in the unimpeded prosecution of criminal cases is jeopardized by the FOIC decision . . . ." (Emphasis added.) Id., 313–14.

In *Light Rigging Co.* v. *Department of Public Utility Control,* 219 Conn. 168, 178, 592 A.2d 386 (1991), we concluded that the plaintiff motor carriers had been aggrieved by a decision of the department of public utility control (DPUC) granting a competitor a license. In *Light Rigging Co.,* the plaintiff motor carriers owned motor carrier certificates issued by DPUC, which were transferable, saleable and tradable in commerce as assets of economic value. Id., 173–74. DPUC had granted a similar certificate to a competitor without, the plaintiffs contended, the consideration of the public need for such additional certificates, required by General Statutes (Rev. to 1985) § 16-286, now recodified as § 13b-392. The parties agreed, and we concurred, that the plaintiffs had met the first prong of the aggrievement test. "The plaintiffs demonstrated their specific personal and legal interest in the subject of the DPUC's decision by alleging and providing evidence that their DPUC certificates . . . authorize them to provide services similar to those that . . . [the competitor's] contested certificate would authorize [the competitor] to provide." Id., 173.[13]

In *Light Rigging Co.,* however, unlike this case, DPUC was specifically required by statute to consider the effect of granting a new certificate of public convenience and necessity on the existing competitors who already held certificates, as well as considering the public need in general. General Statutes (Rev. to 1985)

[13] The plaintiffs also contended, and we agreed, that the trial court had incorrectly concluded that they had failed to satisfy the second prong of the aggrievement test. *Light Rigging Co.* v. *Department of Public Utility Control,* 219 Conn. 168, 174–78, 592 A.2d 386 (1991).

§ 16-286, expressly required DPUC to consider "the existing motor transportation facilities and the effect upon them of granting such certificate" and "the public need for the service the applicant proposes to render . . . ." Id., 176. Additionally, DPUC certificates are transferable, saleable and tradable in commerce as assets of economic value, and therefore, we recognized that new certificates can cause dilution and diminution in the value of those already in existence. Id., 174.

CHHC has different requirements to consider. General Statutes § 19a-153 requires that CHHC consider "whether there is a clear public need for any proposal or request" and "the impact of such proposal, request or submission on the interests of consumers of health care services and the payers for such services." There is no specific statutory requirement, however, on the part of CHHC to consider the impact of an application on existing health care facilities. Nor is there a preexisting presumption of need as stated in General Statutes (Rev. to 1985) § 16-286: "When it appears that no motor common carrier service is being supplied over the route or routes applied for, public convenience and necessity *shall be presumed to require operation of such service.*" (Emphasis added.) Finally, the plaintiffs are not "existing certificate holders who are entitled to be free of competition for which no need has been shown." *Light Rigging Co.* v. *Department of Public Utility Control,* supra, 177. Accordingly, the existence of a specific personal and legal interest in the subject matter of the decision has not been substantiated.

The plaintiffs rely on three United States Supreme Court decisions to support their claim that, as business competitors, they have a legal interest in the defendants' certificate of need application. Notwithstanding the fact that the federal Uniform Administrative Procedure Act differs from the Connecticut UAPA, the cases cited by the plaintiffs do not afford them the sup-

port they seek. In both *Alton R. Co.* v. *United States,* 315 U.S. 15, 62 S. Ct. 432, 86 L. Ed. 586 (1942), and *American Trucking Assns., Inc.* v. *United States,* 364 U.S. 1, 80 S. Ct. 1570, 4 L. Ed. 2d 1527 (1960), the aggrieved plaintiffs were existing common carrier certificate holders, comparable to the plaintiffs in *Light Rigging Co.* v. *Department of Public Utility Control,* supra. In *Association of Data Processing Service Organizations, Inc.* v. *Camp,* 397 U.S. 150, 90 S. Ct. 827, 25 L. Ed. 2d 184 (1970), existing sellers of data processing services challenged a ruling of the comptroller of currency that allowed national banks to provide such services despite the seemingly contrary provisions of § 4 of the Bank Service Corporation Act of 1962. 12 U.S.C. § 1864 (1962). At issue was whether Congress, in passing the statute, intended to protect data processors in companies other than banks from bank competition. If so, then the complainant's interest was at least "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Id., 153.

Neither the plaintiff NERHH nor its stockholders[14] are existing competitors,[15] whose present business operations either are adversely affected by CHHC's decision granting the defendants' certificate of need, or are within the zone of interests to be protected by a particular state statute or constitutional guarantee. The plaintiffs have no present business operations as a rehabilitation hospital.[16]

---

[14] See footnote 1.

[15] The dissent suggests that the hearing had been, in effect, a horse race at which only one competitor could be the winner. This was not the case. CHHC was free to deny the defendants' application, as well as the plaintiffs' application, if it had failed to meet the statutory criteria. CHHC was not committed to granting a certificate of need to either group. Each application had to survive or fall on its own.

[16] The dissenting opinion makes much of the fact that Hartford Hospital has ten rehabilitation beds. Hartford Hospital, however, is merely a coap-

To satisfy the aggrievement requirement of §§ 4-183 (a) and 19a-158, the plaintiffs must allege a legally protected interest that is concrete and actual, not merely one that is hypothetical. A speculative loss of revenue is insufficient to confer standing and establish aggrievement. See *State Medical Society* v. *Board of Examiners in Podiatry,* supra, 301. The plaintiffs claim that the granting of the defendants' certificate of need application caused them to "lose profits, revenues and their competitive positions in the health care community." Specifically, they claim that by granting the defendants' certificate of need application, CHHC has: (1) undermined their ability to demonstrate a need for their facility; (2) diluted the value of their intended certificate of need; and (3) bound them to certain findings made in connection with the defendants' application that would have negative impact in their appeal from the denial of their own application. The first two allegations constitute no more than a suggestion of economic disadvantage caused by competition. This is not sufficient to qualify.[17] See *State Medical Society* v. *Board of Examiners in Podiatry,* supra, and cases cites therein.

## B

In the plaintiffs' third allegation, they claim that they are aggrieved because of the res judicata effect that,

plicant to NERHH application in this case and has not made any separate claim of aggrievement. Moreover, the plaintiffs do not claim that the ten beds are an adequate basis for aggrievement or that Hartford Hospital's ability to operate the ten beds will be adversely impacted by the granting of the certificate of need to the defendants.

[17] The dissent contends that in *Unisys Corporation* v. *Department of Labor,* 220 Conn. 689, 600 A.2d 1019 (1991), this court held that being a potential competitor satisfies the test for aggrievement. See pp. 159–60 of the dissenting opinion. We disagree. In *Unisys Corporation,* we held that the plaintiff would have had standing if it could prove its allegations of favoritism and fraud on the part of the state in the competitive bidding process. We did not hold, as the dissent claims, that the plaintiff had standing merely because it was a potential competitor.

they contend, the decision regarding the defendants' application will have on their appeal from the denial of their own application. They argue that if they are not permitted to appeal CHHC's granting of the defendants' application, the factual findings and conclusions underlying the decision granting the defendants' certificate of need will become res judicata in their appeal of CHHC's decision denying their own application. We disagree.

"Under the doctrine of res judicata, or claim preclusion, a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action on the same claim. A judgment is final not only as to every matter which was offered to sustain the claim, but also as to any other admissible matter which might have been offered for that purpose. *Cromwell* v. *County of Sac,* 94 U.S. 351, 352–53, 24 L. Ed. 195 (1876); 1 Restatement (Second), Judgments §§ 19, 25; James & Hazard, Civil Procedure (2d Ed.) § 11.3." *State* v. *Aillon,* 189 Conn. 416, 423–24, 456 A.2d 279, cert. denied, 464 U.S. 837, 104 S. Ct. 124, 78 L. Ed. 2d 122 (1983). "Collateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim." *In re Juvenile Appeal (83-DE),* 190 Conn. 310, 316, 460 A.2d 1277 (1983). Both issue and claim preclusion "express no more than the fundamental principle that once a matter has been fully and fairly litigated, and finally decided, it comes to rest." *State* v. *Ellis,* 197 Conn. 436, 465, 497 A.2d 974 (1985).

"Administrative law grapples with all the problems of res judicata familiar to the judicial system—identity of claims and issues, identity of parties, final decisions on the merits, collateral attack, jurisdiction—and also with special problems growing out of differences

between the judicial process and the administrative process, including degrees of denial of procedural protection, fluid facts and shifting policies, and parties unrepresented by counsel." 4 K. Davis, Administrative Law Treatise (2d Ed. 1983) § 21.2, p. 50. "As a general proposition, the governing principle is that administrative adjudications have a preclusive effect when the parties have had an adequate opportunity to litigate. *United States* v. *Utah Construction & Mining Co.,* 384 U.S. 394, 422, 86 S. Ct. 1545, 16 L. Ed. 2d 642 (1965)." (Internal quotation marks omitted.) *Convalescent Center of Bloomfield, Inc.* v. *Department of Income Maintenance,* 208 Conn. 187, 195, 544 A.2d 604 (1988); *Corey* v. *Avco-Lycoming Division,* 163 Conn. 309, 318, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116, 93 S. Ct. 903, 34 L. Ed. 2d 699 (1973). " '[A] valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court.' 2 Restatement (Second), Judgments § 83 (1). 'Our rules of res judicata are based on the public policy that "a party should not be allowed to relitigate a matter which it already has had an opportunity to litigate." *In re Juvenile Appeal (83-DE),* [supra, 318] . . . .' *Duhaime* v. *American Reserve Life Ins. Co.,* 200 Conn. 360, 363–64, 511 A.2d 333 (1986)." *Carothers* v. *Capozziello,* 215 Conn. 82, 94, 574 A.2d 1268 (1990).

There are several specific exceptions to the application of res judicata in administrative adjudications. "Some administrative determinations are clearly without res judicata effect in any circumstances—a zoning board after hearing amends a regulation, a utilities commission prescribes a maximum rate, *the [Civil Aeronautics Board] decides which of two airlines should provide a particular service, or [the National Labor Relations Board] refuses to issue a complaint on a par-*

*ticular charge."* (Emphasis added.) K. Davis, Administrative Law Text (3d Ed. 1972) § 18.03, p. 362. " 'A rate order is not res judicata. Every rate order may be superseded by another.' . . . The main reason is that conditions change." Id., § 18.07, p. 368.

The plaintiffs argue, in effect, that the same issues had been *actually litigated and necessarily determined* in the hearing and decision regarding the defendants' certificate of need application, and that the facts found and conclusions reached will have preclusive effect on their ability to litigate fully the appeal regarding CHHC's denial of their own application.[18] The plaintiffs have appealed separately from CHHC's denial of their own application. See part II, infra. Before the trial court, the plaintiffs were not collaterally estopped from challenging any finding in the decision made by CHHC regarding their own application because of or as a result of any findings that CHHC had made in connection with the defendants' application. The plaintiffs were not controlled by the findings regarding the defendants' application, nor have they cited any instance where an applicant, when challenging a decision on its own application for a certificate of need, license or review of the same, has been bound by a finding of fact made in connection with another application. The plaintiffs did not argue this danger to the trial court nor is this claim supported by the record.

---

[18] Our treatment of collateral estoppel tracks the language of § 27 of the Restatement (Second) of Judgments, which states: "When an issue of fact or law is actually litigated *and* determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." (Emphasis added.)

It has been held that in order for collateral estoppel to apply, the adversaries in the second action must have been party adversaries in the first action. *Parklane Hosiery Co.* v. *Shore,* 439 U.S. 322, 326–27, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979). Because the plaintiffs were not parties to the defendants' application; see part I C, infra; the question of mutuality need not be resolved.

The order of CHHC granting the defendants' certificate of need application is not addressed to or directed at the plaintiffs. This case differs significantly from *Carothers* v. *Capozziello,* supra, 95–96, on which the plaintiffs heavily rely. In *Carothers,* we applied the principles of collateral estoppel to a trial regarding violations of clean-up orders issued by the department of environmental protection (DEP) emanating from a hearing held by the commissioner at which the defendants' conduct was the sole issue. Because in one case the defendants had entered into a final consent order, which was entitled to preclusive effect, and because in another case they had been present before the DEP and chose to abandon their opportunity to challenge the conclusion of the commissioner of environmental protection that their activities were illegal, we ruled that the issue of whether the defendants' past behavior constituted a violation of the relevant statutes had been determined between the parties under the doctrine of collateral estoppel. Id.

In this case, at issue in the adjudication of the defendants' application to CHHC was whether the defendants had demonstrated that their project would improve the delivery of health care to the region pursuant to the standards set forth in the governing statutes and regulations. In Docket No. 91-917, CHHC adjudicated only the defendants' application, not the plaintiffs' application. Although the plaintiffs and the defendants had a joint public hearing regarding the relevant facts, the action taken in each application was separate and distinct. CHHC determined the relationship between the plaintiffs' and the defendants' proposals and the community need in each ruling, and the trial court was asked in each of the two appeals to consider whether CHHC's actions had been arbitrary and illegal. The plaintiffs alleged that CHHC had abused its discretion because it had reached inconsistent decisions in both

granting the defendants' application and denying the plaintiffs' application despite reliance on the same evidence. The plaintiffs did not challenge findings made regarding the defendants' application or the use of such findings in their application.[19]

In the absence of any such claim thus far, the plaintiffs, in effect, are asking this court to determine now that certain findings in the decision granting the defendants' application will be res judicata, and that, as a result, the plaintiffs will be estopped from challenging them in their appeal from the denial of their own application. We decline the invitation.

C

The plaintiffs further claim that because they were designated parties to the joint public hearing, they are aggrieved. We disagree with the legal conclusion they ask us to draw as well as with their rendition of the record.

This court has often stated that "[m]ere status . . . as a party or a participant in a hearing before an administrative agency does not in and of itself constitute aggrievement for the purposes of appellate review." *Hartford Distributors, Inc.* v. *Liquor Control Commission,* 177 Conn. 616, 620, 419 A.2d 346 (1979); see also *Milford* v. *Local 1566,* 200 Conn. 91, 96, 510 A.2d 177 (1986); *Bakelaar* v. *West Haven,* 193 Conn. 59, 66, 475 A.2d 283 (1984); *Olsen* v. *Inland Wetlands Commission,* 6 Conn. App. 715, 718, 507 A.2d 495 (1986). If designation as a party in an agency proceeding were construed to be the equivalent of the right to be a party

---

[19] In the appeal from the denial of their own application, the plaintiffs contested the use of evidence gathered pursuant to a sua sponte investigation by CHHC of rehabilitation services in Connecticut under its Docket No. 91-100RES. See General Statutes § 19a-149. The plaintiffs' claim, then and now, is that this gathering of evidence constituted an ex parte communication. See part II, infra.

in a judicial proceeding, an agency's presiding officer would be vested with the authority to decide not only who could appear before the agency and what rights they would have during that proceeding, but also who could challenge an adverse decision of the agency in court. *Rose* v. *Freedom of Information Commission,* 221 Conn. 217, 226, 602 A.2d 1019 (1992).

The plaintiffs reliance on *Light Rigging Co.* v. *Department of Public Utility Control,* supra, to support their contention that their designation as parties to the consolidated proceedings before CHHC satisfies the first prong of the aggrievement test, is misplaced. The plaintiffs in *Light Rigging Co.* demonstrated more than mere party status to support their claims of aggrievement. Indeed, this court specifically stated: "The trial court concluded, and we agree, that the plaintiffs satisfied the first prong of the aggrievement test. The plaintiffs *demonstrated their specific personal and legal interest* in the subject of the DPUC's decision *by alleging and providing evidence* that their DPUC certificates, for the intrastate operations that they own, authorize them to provide services similar to those that [the competitor's] contested certificate would authorize [the competitor] to provide." (Emphasis added.) Id., 173.

This court in *Light Rigging Co.* v. *Department of Public Utility Control,* supra, did not state that the plaintiffs' designation as parties automatically satisfied the first prong of the aggrievement test. We noted only that the trial court should have considered the plaintiffs' designation as parties when determining whether they had been aggrieved. Id., 177–78. The trial court involved herein did consider the plaintiffs' designation as parties and concluded that "the plaintiff[s] offer nothing [other than] such designation was anything more than that accorded an applicant seeking a privilege from the commission," "whose legal rights, duties or privileges will be specifically affected by the com-

mission's decision." Regs., Conn. State Agencies § 19a-160-29. The designation by CHHC of the plaintiffs and the defendants as "parties in this proceeding" was done in accordance with § 19a-160-29 of the Regulations of Connecticut State Agencies by notice in the Hartford Courant after the two applications were consolidated for purposes of hearing. This regulation states in pertinent part: "In issuing the notice of hearing the commission will designate as parties those persons known to the commission . . . whose legal rights, duties or privileges will be specifically affected by the commission's decision and any person who is required by law to be a party in the proceeding." The legal notice stated: "Pursuant to Sections 19a-154 and [19a-]155 of the Connecticut General Statutes, the Commission on Hospitals and Health Care will hold a joint public hearing to hear testimony on the requests of the following facilities . . . . The applicants are designated as parties to this proceeding. . . ."

CHHC is allowed to hold a consolidated hearing pursuant to its authority as set forth in General Statutes § 19a-155 (c), which states in pertinent part: "In conducting its activities under this section and section 19a-154, the commission may hold hearings on applications of a similar nature at the same time." The administrative and trial court records show that the plaintiffs were made a party to the public hearing by virtue of their *own* application because all applicants were made parties to the hearing. This is evidenced from the roster of parties, intervenors and informal participants. RHSC had submitted an application for a certificate of need and was designated as a party in the newspaper legal notice. RHSC, however, withdrew its application prior to the joint hearing, and was designated an intervenor pursuant to § 19a-160-31 of the

Regulations of Connecticut State Agencies.[20] Gaylord Hospital, which did not submit an application, but which specifically claimed to be personally and legally affected by CHHC's decision in that it is authorized to operate a rehabilitation hospital and would suffer a competitive effect, requested and was denied party status. Instead, Gaylord Hospital participated as an intervenor. Both parties and intervenors were allowed to present statements, offer testimony and cross-examine all witnesses.

Persons or entities applying for party status under § 19a-160-30 of the Regulations of Connecticut State

---

[20] Section 19a-160-31 of the Regulations of Connecticut State Agencies provides: "(a) FILING OF PETITION. Any person that proposes to be designated or admitted as an intervenor shall file a written petition to be so designated and shall mail copies to all parties not later than 5 calendar days before the date of hearing. For good cause shown, the presiding officer may waive the five day requirement.

"(b) CONTENTS OF REQUEST. The request of the proposed intervenor shall state such person's name and address and shall describe the manner in which that person is affected by the contested case. The proposed intervenor shall further state what way and to what extent that person proposes to participate in the hearing, and shall summarize any evidence that person proposes to offer.

"(c) DESIGNATION AS INTERVENOR. The presiding officer will act on behalf of the commission to determine the proposed intervenor's participation in the hearing, taking into account whether or not such participation will furnish assistance to the commission in resolving the issues of the contested case. The presiding officer may grant the request to intervene if the presiding officer finds that the proposed participation as an intervenor will add evidence or arguments on the issue of the contested case that would otherwise not be available to the commission, is in the interest of justice and will not impair the orderly conduct of the proceedings.

"(d) LIMITATION ON PARTICIPATION. The intervenor's participation shall be limited to those particular issues, that state of the proceeding and that degree of involvement in the inspection and copying of records, presentation of evidence and argument that the presiding officer shall permit at the time such intervention is allowed, and thereafter by express order upon further application by the said intervenor or upon a finding by the presiding officer that an intervenor's participation must be further restricted so as to promote the orderly conduct of the proceedings."

Agencies must demonstrate how their legal rights, duties and privileges will be affected by CHHC's decision, and CHHC, through its presiding officer, is thereby given the opportunity to make a judgment in this regard. In this case, the plaintiffs did not argue for party status in regard to the defendants' application pursuant to any regulation, and CHHC never specifically ruled on the issue. In *Light Rigging Co.* v. *Department of Public Utility Control,* supra, 177, the trial court noted, *after* finding that the first prong of the aggrievement test had been satisfied, that the plaintiffs had been made parties pursuant to § 16-1-17 (c) of the Regulations of Connecticut State Agencies. This regulation requires that the person requesting party status file a petition describing the manner in which the petitioner claims to be substantially and specifically affected by the proceeding, and the nature of the evidence. The DPUC then considers the petition and makes a determination. This court stated in *Light Rigging Co.*: "[A]t the administrative level, there was a finding that the plaintiff's legal rights, duties or privileges would be affected by the agency's decision regarding the issuance of a certificate to [a competitor]. While the plaintiffs' status as parties at the agency level does not constitute aggrievement; *Bakelaar* v. *West Haven,* supra, 66; the trial court should have closely reviewed this administrative finding because many of the elements considered by the agency in granting this status closely track the elements that the court would have to find to determine whether a party is aggrieved." *Light Rigging Co.* v. *Department of Public Utility Control,* supra, 178.

The trial court in this case was correct to look behind the label of "party status" to see if there were facts in the record to establish that the plaintiffs had a specific personal and legal interest in the subject matter of the decision about the defendants' certificate of need,

and what CHHC actually did or, in this case, did not do—namely to make a judgment on the merits of the party status in this case. The administrative record indicates that the proceedings were consolidated specifically for the purpose of the public hearing. The applications themselves were never consolidated into a single docket number and separate decisions were issued for each docket number. In fact, CHHC, in its proposed final decision with regard to the defendants' application, did not list the plaintiffs as parties, intervenors or informal participants to the application. Rather, CHHC acknowledged the consolidation of the hearings on both the plaintiffs' and the defendants' certificate of need applications and merely identified the plaintiffs as "the participants for [the plaintiffs'] applica[tion]." As such, there is nothing in the administrative record or the trial court record to indicate that CHHC's designation of the plaintiffs as parties to the joint public hearing was based on any particular determination regarding the legal effect of the defendants' application on the plaintiffs' application. The designation of "party status" under the facts of this case, therefore, confers no personal or legal interest that would justify a conclusion that the plaintiffs were aggrieved.

## D

Even assuming that the plaintiffs had established a specific personal and legal interest to satisfy the first part of the *Light Rigging Co.* test, they failed as to the second prong, namely, to prove that such interest had been specially and injuriously affected by CHHC's decision. Loss of future revenues is but a prospective and speculative injury, insufficient to qualify the plaintiff as aggrieved, unless the competition at issue is "unfair" or "illegal." *State Medical Society* v. *Board of Examiners in Podiatry,* 203 Conn. 295, 302–303, 524 A.2d 636 (1987), and cases cited therein; see *Unisys Corporation* v. *Department of Labor,* 220 Conn. 689,

693–95, 600 A.2d 1019 (1991). In such instance, this court has recognized " 'that it has always been [proper] that a professional man has standing to prevent the *improper* invasion of his profession.' " (Emphasis in original.) *State Medical Society* v. *Board of Examiners in Podiatry,* supra, 303.

The plaintiffs claim that it was unfair competition, indistinguishable from that alleged in *Light Rigging Co.* v. *Department of Public Utility Control,* supra, for CHHC to grant the defendants' certificate of need for a sixty bed facility despite having found in its denial of the plaintiffs' application that "there was no need for 90 (or even 60) new rehabilitation beds in the Hartford area." CHHC approved the defendants' alternative Scheme B-60 plan that provided for the closing of sixty beds at two of the three defendant hospitals and for the opening of a new sixty bed rehabilitation hospital at the site of the former Hebrew Home and Hospital. Approval of the new facility, Central Connecticut Rehabilitation Hospital, Inc., "allows the creation of a facility with a 60 rehabilitation bed configuration without adding any beds to the system. A 60 bed facility will provide the anchor which is necessary to address the quality/accessibility issues that have resulted from the current fragmentation in the delivery of rehabilitation services." The plaintiffs' plan, on the contrary, was deemed "limited in scope . . . address[ing] the needs of the applicant and not the needs of the health care delivery system in a cost-effective manner. Instead of improving upon the fragmentation that currently exists, the proposal only serves to create an additional facility and 90 additional beds . . . with minimal savings. For example, there are no reductions in the number of beds at Hartford Hospital or in the Hartford area due to the implementation of this proposal. The addition of rehabilitative beds with no major savings is not warranted."

CHHC denied the plaintiffs' application because it found that it would not be cost-effective to the health care system on a long term basis. The plaintiffs had not proven that there was a need for a new ninety bed facility or even for a facility of sixty *new* rehabilitation beds. Furthermore, CHHC found the plaintiffs' smaller sixty bed alternative to be lacking in other significant ways: it would not have a separate identity from the psychiatric hospital; and it would lack a patient dining room and a pool. The plaintiffs' application for a smaller facility simply did not meet the criteria under General Statutes § 19a-153.

The label that CHHC's decision was "illegal" or "unfair," ascribed by the plaintiffs in order to fit within the *Light Rigging Co.* analysis, does not fit. "Unfairness" in *Light Rigging Co.* v. *Department of Public Utility Control,* supra, stemmed from the fact that, despite a statutory mandate, DPUC never considered public need in issuing a certificate of need to the applicant. The final decision of CHHC in the present case reflects great consideration of the public need and the potential of substantial savings to the existing health care delivery system.

## II

In the plaintiffs' second appeal, they claim that the trial court incorrectly concluded that CHHC had properly (1) conducted an investigatory hearing after the plaintiffs had filed their application for a certificate of need, (2) introduced a report containing the findings and conclusions from this hearing into evidence at the subsequent contested hearing, and (3) permitted Commissioner Farrell to conduct both the investigative hearing and the contested hearing in violation of General Statutes § 4-176e. We disagree.

The plaintiffs' first two claims essentially challenge the interaction of two distinct, yet often overlapping,

functions of CHHC as an administrative agency: regulation and adjudication.[21] Each of these functions entails separate and distinct duties, and the rights afforded to the parties in relation to each function are quite different. Because CHHC is responsible for ultimately regulating Connecticut's health care in the best interests of the state; see General Statutes § 19a-150;[22] however, its regulatory and adjudicatory duties often necessarily overlap.

As a regulatory agency, CHHC must manage and control the amount and cost of health care in this state. General Statutes (Rev. to 1991) § 19a-150; 16 S. Proc., Pt. 4, 1973 Sess., p. 1466, remarks of Senator Louise S. Berry (CHHC will "improve the delivery and the quality of health care services for the people of this state, while serving the public's interest through review and regulation of the increases in costs in order to improve efficiency, coordinate the use of facilities and services, lower costs and expand the availability of health care throughout the State"); see generally *Commission on Hospitals & Health Care* v. *Lakoff,* 214 Conn. 321, 331, 572 A.2d 316 (1990). Specifically, CHHC has a duty to determine the need, if any, for rehabilitation services in the Hartford area and the most cost-effective man-

---

[21] CHHC is governed by General Statutes chapter 368c, entitled "Commission on Hospitals and Health Care," §§ 19a-145 through 19a-168r, and by chapter 54, the Connecticut Uniform Administrative Procedure Act, §§ 4-166 through 4-189. These two chapters collectively set forth the regulatory and adjudicatory duties of CHHC.

[22] General Statutes (Rev. to 1991) § 19a-150 provides: "GENERAL DUTIES OF COMMISSION. The commission, in consultation with the state bureau of health planning and development, shall carry out a continuing state-wide health care facility utilization review, including a study of existing health care delivery systems; recommend improvements in health care procedures to the health care facilities and institutions; recommend to the commissioner legislation in the area of health care programs; and report annually to the governor and the general assembly, on January first, its findings, recommendations and proposals for improving efficiency, lowering health care costs, coordinating use of facilities and services and expanding the availability of health care throughout the state."

ner to provide for that need. See General Statutes (Rev. to 1991) § 19a-150; see also 16 S. Proc., Pt. 4, 1973 Sess., pp. 1469–70, remarks of Senator Louise S. Berry (the "power to review and regulate capital improvements should over a period of time minimize the waste that occurs . . . in over building hospital bed space").

In assessing this state's need for particular health services, CHHC has the authority to conduct investigations. General Statutes § 19a-149;[23] see 3 J. Stein, G. Mitchell & B. Mezines, Administrative Law (1992) § 19.01. " 'The investigatory function is designed to produce information. . . .' " 3 J. Stein, G. Mitchell & B. Mezines, supra, p. 19-2 n.4. It is "nonpartisan and nonadversary." Id., p. 19-11.

Because investigations in this regulatory context are generally nonadversary proceedings, they are not contested cases within the meaning of the UAPA. A contested case is "a proceeding . . . in which the legal rights, duties or privileges of a party are required by statute to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held . . . ." General Statutes § 4-166 (2). The UAPA requires agencies to provide certain protections and safeguards to assure full and fair administrative proceedings in contested cases. See, e.g., General Statutes § 4-177c ("[i]n a contested case, each party and the agency conducting the proceeding shall be afforded the opportunity [1] to inspect and copy relevant and material records, papers and documents not in the possession of the party of such agency . . . and [2] at a hearing, to respond, to cross-examine other parties, intervenors, and witnesses, and to present evidence and argument on all issues involved"). The protections of

[23] The parties agree that CHHC has the authority to conduct general investigations pursuant to General Statutes § 19a-149. For the text of General Statutes § 19a-149, see footnote 4.

the UAPA are not required or necessary in general investigations because the parties' rights are not being adjudicated. See *Benton-Hecht Moving & Storage, Inc.* v. *Call,* 782 S.W.2d 668 (Mo. App. 1989) (because uncontested cases are not adversarial, cross-examination is not necessary). Rather, CHHC, in the course of these general investigations, objectively determines, in the best interest of the state, the need, if any, for rehabilitation services.

The adjudicatory duties of CHHC include presiding, through hearing officers, in contested cases. General Statutes § 19a-155 (a). Because parties' rights or duties are being adjudicated in contested cases, the UAPA requires an agency to provide certain protections for the parties in order to ensure a full and fair hearing. "All parties must be fully apprised of the evidence submitted or to be considered, and must be given an opportunity to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal." (Internal quotation marks omitted.) *Jaffe* v. *Department of Health,* 135 Conn. 339, 346, 64 A.2d 330 (1949), quoting *Interstate Commerce Commission* v. *Louisville & Nashville R. Co.,* 227 U.S. 88, 93, 33 S. Ct. 185, 57 L. Ed. 2d 431 (1913); see *Connecticut Natural Gas Corporation* v. *Public Utilities Control Authority,* 183 Conn. 128, 139 n.9, 439 A.2d 282 (1981) ("Before an administrative agency may lawfully rely on material nonrecord facts within its special knowledge and experience *or which it has learned through investigation,* it must allow a party adversely affected thereby an opportunity to rebut at an appropriate stage in the proceedings." [Emphasis added.]); *Parsons* v. *Board of Zoning Appeals,* 140 Conn. 290, 292–93, 99 A.2d 149 (1953); see also C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 1.2.5. Against this background, we will examine the plaintiffs' claims.

## A

The plaintiffs first claim that CHHC improperly held an independent investigation after the plaintiffs filed their application for a certificate of need. The plaintiffs concede that CHHC generally has the authority to hold an investigatory hearing under § 19a-149, and that the investigatory hearing was uncontested. The plaintiffs further concede that if CHHC had initiated the investigatory proceeding prior to the plaintiffs' filing of their application, the plaintiffs could not make the same challenge regarding the investigation that it does in this appeal.

The plaintiffs contend, however, that once they filed their application, CHHC could no longer initiate an independent investigation into need without the plaintiffs' adversarial participation. The essence of the plaintiffs' argument appears to be that because CHHC was required to assess need and cost-effectiveness in the context of its review of the plaintiffs' application in the contested case pursuant to General Statutes § 19a-153,[24]

[24] General Statutes § 19a-153 provides in pertinent part: "CONSIDERA-TIONS IN COMMISSION DELIBERATIONS; WRITTEN FINDINGS. AVAILABILITY OF INFORMATION. USE OF CHARITABLE GIFTS. (a) In any of its deliberations involving a proposal, request or submission regarding rates or services by a health care facility or institution, the commission shall take into consideration and make written findings concerning each of the following principles and guidelines: The relationship of the proposal, request or submission to the state health plan; the relationship of the proposal, request or submission to the applicant's long-range plan; the financial feasibility of the proposal, request or submission and its impact on the applicant's rates and financial condition; the impact of such proposal, request or submission on the interests of consumers of health care services and the payers for such services; the contribution of such proposal, request or submission to the quality, accessibility and cost-effectiveness of health care delivery in the region; whether there is a clear public need for any proposal or request; whether the health care facility or institution is competent to provide efficient and adequate service to the public in that such health care facility or institution is technically, financially and managerially expert and efficient; that rates be sufficient to allow the health care facility or institution

it could not, while the plaintiffs' application was pending,[25] and without their adversarial participation, conduct an independent regulatory investigation pursuant to § 19a-149 to discover the status of rehabilitative care in Connecticut. Thus, although the plaintiffs concede that the investigation was an uncontested case, they claim that investigations pursuant to § 19a-149 that are conducted following the filing of an application are, in effect, contested cases, and that the plaintiffs should be afforded all the rights the UAPA grants to parties in contested cases. The plaintiffs specifically contend that by conducting this investigation, CHHC deprived the plaintiffs of the rights granted by the UAPA to cross-examine witnesses and present relevant evidence. We decline to interpret § 19a-149 in this way.

First, § 19a-149 does not expressly prohibit CHHC from conducting a general independent investigation after a related application is pending, nor does it require that the parties to a pending application be made parties to the general investigation.[26] Therefore, CHHC

to cover its reasonable capital and operating costs; the relationship of any proposed change to the applicant's current utilization statistics; the teaching and research responsibilities of the applicant; the special characteristics of the patient-physician mix of the applicant; the voluntary efforts of the applicant in improving productivity and containing costs; and any other factors which the commission deems relevant, including, in the case of a facility or institution as defined in subsection (c) of section 19a-490, such factors as, but not limited to, the business interests of all owners, partners, associates, incorporators, directors, sponsors, stockholders and operators and the personal backgrounds of such persons.

"(b) Any data submitted to or obtained or compiled by the commission with respect to its deliberations under sections 19a-151 to 19a-156, inclusive, with respect to nursing homes, licensed under chapter 368v, shall be made available to the department of health services."

[25] The plaintiffs application was not deemed complete until July 18, 1991. We refer to the plaintiffs' application as "pending" to mean that the plaintiffs' application had been filed, but was incomplete.

[26] Indeed, § 19a-160-20 (a) of the Regulations of Connecticut State Agencies provides that the rules should not be construed "to preclude such neces-

was not prohibited by statute from conducting an investigation while the plaintiffs' application was pending.

Second, it is clear that CHHC's investigation in this case was not a contested case. The investigation conducted by CHHC was a general fact finding investigation and did not determine any parties' applications or particular proposals. The findings and conclusions reached by CHHC concerned only the status of rehabilitation services in Connecticut. Indeed, CHHC specifically instructed that "[n]o testimony concerning the specific proposals for any rehabilitation service certificates of need filed or expected to be filed with the Commission will be received at this proceeding." Because the investigatory hearing was not a contested case, the UAPA protections did not apply to that hearing. There is no requirement under the UAPA that CHHC provide all the rights afforded parties in a contested case in an investigatory proceeding. The plaintiffs, therefore, did not have the right at the investigatory hearing to cross-examine witnesses.

Moreover, the investigatory proceeding was not, in this case, an adjudicatory function of CHHC. Although the investigation may be related to the plaintiffs' contested case, the scope of the investigation itself was associated with CHHC's regulatory duty. This is an example of the overlap of CHHC's regulatory and adjudicatory functions. CHHC was investigating the needs of the state of Connecticut concerning rehabilitation facilities. CHHC must be able to assess objectively and accurately the health care needs of the state in order to satisfy its regulatory duty to provide a comprehensive and efficient medical care system. To accept the plaintiffs' argument would be to tie CHHC's hands

---

sary routine communications as are necessary to permit the commission staff to investigate facts . . . in a contested case at any time before, during and after the hearing thereof."

by requiring it to make a decision that affects the regulation of rehabilitation in the state based solely on the "evidentiary record and arguments advanced by the parties." C. Peck, "Regulation and Control of Ex Parte Communications with Administrative Agencies," 76 Harv. L. Rev. 233, 261 n.113 (1962). Although, in some cases, presentation of the evidence by the parties may be adequate, the parties may occasionally fail to present the necessary evidence. Additionally, CHHC has the duty to act in the best interest of the state, while the parties generally act in their own best interest. These two objectives may occasionally conflict.

Accordingly, we conclude that CHHC was within its authority to initiate a general fact finding investigation pursuant to § 19a-149.

B

The plaintiffs further argue that even if it was proper for CHHC to conduct an investigation, it was improper to introduce the report containing those findings into evidence in the contested case. This report, the plaintiffs claim, constituted an ex parte communication, and thus, the defendants had the burden of proving that the report did not prejudice the plaintiffs. See *Martone* v. *Lensink,* 207 Conn. 296, 301, 541 A.2d 488 (1988). Because we conclude that the report was not an ex parte communication within the meaning of the UAPA, we disagree.

After making findings and conclusions regarding the existing and needed rehabilitation facility, CHHC had to perform its adjudicatory function because the plaintiffs and the defendants submitted proposals to provide rehabilitation services. As adjudicators, CHHC was required to determine which proposal or proposals would fulfill the need for rehabilitation services in the most cost-effective manner. Because CHHC was then determining the right of the parties to provide reha-

bilitation services, this hearing constituted a contested case. As such, CHHC was required to afford all the rights and protections provided by the UAPA to the parties. At the contested hearing, it is undisputed that CHHC allowed the parties the opportunity to cross-examine witnesses and to present relevant evidence. CHHC also introduced into evidence the report containing the findings and conclusions made at the prior investigatory hearing. The presiding officer, Farrell, specifically stated at the beginning of the contested hearing that the plaintiffs "could address any deficiencies [they] found in [the investigative report]." The plaintiffs did not challenge the findings in the report, nor did they subpoena the witnesses from the investigatory hearing to cross-examine them at the contested hearing.

The plaintiffs claim that, because CHHC introduced the report of the findings and conclusions from the uncontested hearing into evidence at the contested case, they were deprived of the protections and rights of the UAPA. The plaintiffs are contending, in effect, that CHHC's regulatory duty improperly interfered with their adjudicatory duty to provide the plaintiffs with a fair hearing. Specifically, the plaintiffs claim that the report was an ex parte communication and thus the burden is on the defendants to prove that it was not prejudicial to the plaintiffs. We disagree.

An ex parte communication is not expressly defined in the UAPA. Instead, the UAPA provides restrictions on communications received or directed at the decision maker in a *contested case*. General Statutes § 4-181 (a)[27]

[27] General Statutes § 4-181 provides: "CONTESTED CASES. COMMUNICA- TIONS BY, TO HEARING OFFICERS AND MEMBERS OF AN AGENCY. (a) Unless required for the disposition of ex parte matters authorized by law, no hearing officer or member of an agency who, in a contested case, is to render a final decision or to make a proposed final decision shall communicate,

provides in part that "no hearing officer . . . in a contested case . . . shall communicate, directly or indirectly, in connection with any issue of fact, with any person or party, or, in connection with any issue of law . . . without notice and opportunity for all parties to participate." This court has stated that the purpose of § 4-181 is "to prevent one party from exerting improper influence on the decisionmaker." *Martone* v. *Lensink*, supra, 303.

The language of § 4-181 does not apply to this situation. Farrell, the decision maker, did not communicate with a person or party regarding any issue of fact or law in a contested case because the investigatory hearing, as conceded by the plaintiffs, was not a contested case. The communication received during that proceeding, therefore, was not a prohibited communication.

directly or indirectly, in connection with any issue of fact, with any person or party, or, in connection with any issue of law, with any party or the party's representative, without notice and opportunity for all parties to participate.

"(b) Notwithstanding the provisions of subsection (a) of this section, a member of a multimember agency may communicate with other members of the agency regarding a matter pending before the agency, and members of the agency or a hearing officer may receive the aid and advice of members, employees, or agents of the agency if those members, employees, or agents have not received communications prohibited by subsection (a) of this section.

"(c) Unless required for the disposition of ex parte matters authorized by law, no party or intervenor in a contested case, no other agency, and no person who has a direct or indirect interest in the outcome of the case, shall communicate, directly or indirectly, in connection with any issue in that case, with a hearing officer or any member of the agency, or with any employee or agent of the agency assigned to assist the hearing officer or members of the agency in such case, without notice and opportunity for all parties to participate in the communication.

"(d) The provisions of this section apply from the date the matter pending before the agency becomes a contested case to and including the effective date of the final decision. Except as may be otherwise provided by regulation, each contested case shall be deemed to have commenced on the date designated by the agency for that case, but in no event later than the date of hearing."

Moreover, the prohibition of certain communications in administrative proceedings is based on the principle that the decision maker should not receive information to which one or all of the parties are not given an opportunity to respond. The prohibition against ex parte communications "is intended to preclude litigious facts reaching the deciding minds without getting into the record." Model State Administrative Procedure Act, comment to § 13, 15 U.L.A. 292 (Master Ed. 1990); *Martone* v. *Lensink,* supra, 303. This did not occur here. The report was introduced into evidence at the contested hearing and the plaintiffs were given an opportunity to explain or rebut the conclusions in the report or subpoena and cross-examine the witnesses at the investigatory hearing. Additionally, the plaintiffs were able to comment in writing regarding the investigatory hearing at various stages prior to the issuance of CHHC's report.

Unlike judicial proceedings, an administrative board "may act upon facts which are known to it even though they are not produced at the hearing." *Parsons* v. *Board of Zoning Appeals,* supra, 292; *Jaffe* v. *State Department of Health,* supra, 349. Administrative agencies are "not bound as is a court to acquire information concerning matters involved in the proceedings before it entirely from the evidence produced." 2 Am. Jur. 2d 195, Administrative Law § 388. "[I]t is generally held that even though an administrative authority has statutory power to make independent investigations, it is improper for it to base a decision or findings upon facts so obtained, unless such evidence is introduced at a hearing or otherwise brought to the knowledge of the interested parties prior to the decision, with an opportunity to explain and rebut." Id. An administrative agency may make use of reports and data gathered by members of its own staff or outside investigators or investigating bodies or reports or

advisory panels, but generally cannot properly base its decision and findings upon such reports without introducing them in evidence so as to afford interested parties an opportunity to meet them. Id. "[A]t the [contested] hearing no one may be deprived of the right to produce relevant evidence or to cross-examine witnesses produced by his adversary . . . ." *Parsons* v. *Board of Zoning Appeals,* supra, 293.

In this case, the plaintiffs were given the opportunity to rebut the conclusions in the report and an opportunity to subpoena witnesses and cross-examine them regarding their previous testimony.[28] The hearing officer, Farrell, stated at the beginning of the contested case that the parties could challenge the conclusions and findings in CHHC's report. Thus, although the plaintiffs chose not to challenge the findings and conclusions of the report or to subpoena witnesses, they were provided with the opportunity to do so. Accordingly, the report was properly introduced into evidence in the plaintiffs' contested case.

C

The plaintiffs' final claim is that CHHC violated General Statutes § 4-176e[29] by assigning Farrell to preside

---

[28] The plaintiffs state in their brief that CHHC sent out over 100 questionnaires as part of its investigation, but only NERHH's response became part of the report and, consequently, part of the evidence in the contested case. Thus, the plaintiffs contend that CHHC based its decision on facts that were not introduced into evidence at the contested hearing. The plaintiffs, however, have failed at all stages of this litigation to provide or point to any evidence that CHHC received other responses or based their decision on anything other than the testimony of the speakers and NERHH's report.

[29] General Statutes § 4-176e provides: "AGENCY HEARINGS. Except as otherwise required by the general statutes, a hearing in an agency proceeding may be held before (1) one or more hearing officers, provided no individual who has personally carried out the function of an investigator in a contested case may serve as a hearing officer in that case, or (2) one or more of the members of the agency."

over the contested hearing because he had also conducted the prior independent investigation. We disagree.

Section 4-176e provides in pertinent part that "a hearing in an agency proceeding may be held before . . . one or more hearing officers, provided no individual who has personally carried out the function of an investigator in a *contested case* may serve as a hearing officer in *that case* . . . ." (Emphasis added.) This statute forbids a person who has acted as an investigator in a contested case to sit as an adjudicator in that contested case. The statute does not apply to hearing officers sitting as presiding officers in general investigations that are not contested cases. The statute does not forbid an officer from conducting a general investigation in an uncontested case and subsequently presiding as the adjudicator in a contested case. In this case, the plaintiffs do not dispute that the general investigation conducted by Farrell was an uncontested case. Because Farrell conducted an investigation in an uncontested case, not a contested case, § 4-176e does not apply. Consequently, Farrell was not prohibited from sitting as the presiding officer in the plaintiffs' contested hearing.

Furthermore, the fact that Farrell conducted a prior general investigation does not necessarily mean that his mind was "irrevocably closed on the subject." *Federal Trade Commission* v. *Cement Institute,* 333 U.S. 683, 701, 68 S. Ct. 793, 92 L. Ed. 1010 (1948). "It is not violative of due process for the same authority which initiated the subject of the hearing to listen to and determine its outcome as long as that authority gives the person appearing before it a fair, open and impartial hearing." *Petrowski* v. *Norwich Free Academy,* 2 Conn. App. 551, 554 n.5, 481 A.2d 1096 (1984), rev'd on other grounds, 199 Conn. 231, 506 A.2d 139 (1986), appeal dismissed, 479 U.S. 802, 107 S. Ct.

42, 93 L. Ed. 2d 5 (1986). An administrative agency can be the investigator and adjudicator of the same matter without violating due process. *Withrow* v. *Larkin,* 421 U.S. 35, 46–55, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975); *Petrowski* v. *Norwich Free Academy,* supra, 571 (*Borden, J.,* dissenting).

Moreover, it should be noted that the plaintiffs failed to raise the disqualification of Farrell at the beginning of their contested case. The plaintiffs clearly knew, from their participation in the investigative hearing and the contested case, that Farrell was the investigative hearing officer and that he was subsequently appointed as the hearing officer in the contested case. Nevertheless, the plaintiffs did not request a different adjudicator at the contested hearing.

"We have made it clear that we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the trial." (Internal quotation marks omitted). *Henderson* v. *Department of Motor Vehicles,* 202 Conn. 453, 462, 521 A.2d 1040 (1987); see *Knock* v. *Knock,* 224 Conn. 776, 792, 621 A.2d 267 (1993). "The failure to raise a claim of disqualification with reasonable promptness after learning the ground for such a claim ordinarily constitutes a waiver thereof." (Internal quotation marks omitted.) *Clisham* v. *Board of Police Commissioners,* 223 Conn. 354, 367, 613 A.2d 254 (1992); *Henderson* v. *Department of Motor Vehicles,* supra.

The plaintiffs obviously knew of Farrell's dual participation, but nevertheless "continued to participate at the hearing and to seek a favorable resolution of the proceeding on the merits." *Henderson* v. *Department of Motor Vehicles,* supra, 463. We conclude, therefore,

that the plaintiffs failed to raise the argument of disqualification pursuant to § 4-176e within a reasonable period of time and have thus waived it.

The judgments are affirmed.

In this opinion BORDEN and F. X. HENNESSY, Js., concurred.

BARALL, J., concurring. In this consolidated case, two medical consortium groups, one headed by Hartford Hospital (the plaintiffs) and the other by St. Francis Hospital and Medical Center (the defendants) submitted applications for a certificate of need to the commission on hospitals and health care to create an additional rehabilitation facility in Hartford. Both groups had rehabilitative beds in their current operations. CHHC consolidated the two applications in one hearing, deciding that, at best, there was room for only one additional rehabilitation facility. It granted the defendants' application as amended and denied the plaintiffs' application.

The plaintiffs took two separate appeals to the Superior Court from the decision of CHHC. In Docket No. 14586, the plaintiffs appealed the decision granting the defendants' application. In Docket No. 14617, the plaintiffs appealed the decision denying their application. Both appeals raised the same issues on the merits. The court, *Burns, J.*, granted a motion to dismiss in Docket No. 14586 based on a claim of lack of standing of the plaintiffs to appeal a decision granting the defendants' application. The court, *Hodgson, J.*, rendered judgment dismissing the plaintiffs' appeal of the denial of their own application on the merits of the case. The plaintiffs appealed from both decisions and the cases were consolidated for argument in this court.

How far the court door should be open to plaintiffs in administrative appeals has been the subject of debate

throughout the country. On one end of the spectrum of decisions on the subject of "aggrievement" or "standing to appeal" are those jurists who would open the door of aggrievement only when the merits of the case invite their philosophical attention. At the other end of the spectrum are those jurists who would allow most plaintiffs through the door of aggrievement without much question. See comment, "Standing of Third Parties to Challenge Administrative Agency Actions," 76 Cal. L. Rev. 1061 (1988).

If Connecticut is to have a practical concept of aggrievement to ensure that there is a real case with a real injury as philosophically commended in *Board of Pardons* v. *Freedom of Information Commission,* 210 Conn. 646, 556 A.2d 1020 (1989), then the facts of this case call out for "standing" and "aggrievement."

The decision to grant the defendants' application is the alter ego of the decision to deny the plaintiffs' application. The two are inextricably linked and should be linked and consolidated for purposes of aggrievement and appeal.

If similar cases in the future are not consolidated by this court or the Superior Court for aggrievement purposes, CHHC could be faced with reconsidering an unsuccessful applicant's application after a successful applicant had commenced service in an area where CHHC found service should be limited to only one service provider.

The plaintiffs here do have a specific personal and legal interest in the granting of the defendants' application, and additionally, the plaintiffs' interests have been legally and injuriously affected by the granting of the defendants' application.

I agree with the dissent's treatment of aggrievement. I concur, however, with the majority on the merits of the plaintiffs' appeal from the denial of their application.

Here, the plaintiffs had the opportunity to present their claims on the merits in both cases because the plaintiffs' appeal from the denial of their application (Docket No. 14586) was consolidated with their appeal from the granting of the defendants' application (Docket No. 14617) by this court, and the claims on the merits were the same in both cases.

Therefore, the issues in Docket No. 14617 are moot because they were heard in Docket No. 14586.

BERDON, J., dissenting.

## I

### THE PLAINTIFFS' STANDING TO APPEAL (14586)

We continue to pursue a course of keeping the doors to the court barred to litigants under the guise of our purported jurisdiction. I agree that we must have some rules to protect litigants from unjusticiable litigation—but those rules of jurisdiction must be reasonable. We have repeatedly held that "[s]tanding is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of [a] direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy." (Citations omitted; internal quotation marks omitted.) *Board of Pardons* v. *Freedom of Information Commission*, 210

Conn. 646, 648–49, 556 A.2d 1020, on remand, 19 Conn. App. 539, 563 A.2d 314 (1989). I would find that the plaintiffs[1] have standing to appeal from the order of the defendant Commission on Hospitals and Health Care (CHHC) granting to the defendants[2] a certificate of need for rehabilitation beds.

What is especially troubling to me is that this appeal involves not only the rights of the litigant health care providers, but also the interests of the public in cost effective and efficient medical treatment. The public interest is not served unless we give competing health care providers standing to appeal the grant of a competitor's certificate of need.

The majority holds that the plaintiffs are not aggrieved.[3] I agree that ordinarily "aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision." (Internal quotation marks omitted.) *Cannavo Enterprises, Inc.* v. *Burns,* 194 Conn. 43, 47, 478 A.2d 601 (1984).

---

[1] The plaintiffs in both appeals are New England Rehabilitation Hospital of Hartford, Inc., Hartford Hospital, the Institute of Living and AdvantageHealth Corporation.

[2] The defendants are Central Connecticut Rehabilitation Hospital, Inc., Saint Francis Hospital and Medical Center, the Mount Sinai Hospital Corporation and the Hartford Rehabilitation Hospital, Inc., and the Commission on Hospitals and Health Care (CHHC). Reference herein to the defendants will include all the defendants except CHHC.

[3] "[I]n order to have standing to bring an administrative appeal, a person must be aggrieved." (Internal quotation marks omitted.) *Light Rigging Co.* v. *Department of Public Utility Control,* 219 Conn. 168, 172, 592 A.2d 386 (1991).

I believe that the plaintiffs have satisfied this standard because they are health care providers competing with the defendants for the same certificate of need to provide rehabilitative services.

The record made it clear that the parties were in competition with each other and that one and only one certificate of need would be granted.[4] Both parties submitted applications for a certificate of need for rehabilitation beds, which were consolidated by CHHC for hearing purposes. The CHHC record indicates that there was a limited need for rehabilitation beds in the service area targeted by the plaintiffs and the defendants. CHHC inventoried the existing rehabilitation beds in this area and found that the recent use of the total of 113 beds was approximately 58 percent.[5] Finally,

---

[4] It is clear, based on CHHC's finding that there was a limited need for services and its concern that they be consolidated, that only one certificate would be issued. Furthermore, the chairman stated: "I am not totally convinced that we need additional rehab beds in Connecticut. I think there may be different ways of improving rehab, but not being sure, I'm going to go along with this decision, giving the [certificate of need] to the [Hartford Rehabilitation Hospital, Inc., a wholly owned subsidiary of] Continental Medical Systems with St. Francis and Mt. Sinai. But let me lay this out to others that may be looking at this. The amount of convincing that I'm going to have to hear for additional rehab beds at this point in time is going to have to be real good and real convincing because I'm not sure that we really do need any more."

[5] CHHC indicates the following utilization of existing rehabilitation beds within the applicants' primary service area:

| "Mount Sinai Hospital | 24 beds | 51% utilization |
| Saint Francis Hospital | 9 beds | 78% utilization |
| New Britain Memorial | 48 beds | 65% utilization |
| Newington Children's | 22 beds | 38% utilization |
| Hartford Hospital | 10 beds | Not available." |

In calculating the total percentage of utilization, I did not include the ten beds operated by Hartford Hospital because the record did not supply information on its utilization. If we were to assume, however, that Hartford Hospital had a utilization rate of 100 percent, the overall utilization rate would be 61 percent.

The investigatory report by CHHC also indicates that the need for rehabilitative services is met by a variety of sources as follows: "Although

CHHC compared the quality of current rehabilitative services delivered by the defendants to that delivered by the plaintiffs in granting the defendants their certificate of need. These facts demonstrate unequivocally that the parties were competitors.

Common sense dictates that when CHHC acts upon competing proposals, granting one and denying the other, the party who is denied the certificate of need is aggrieved. This is especially so when only one certificate will be awarded. The fact that the order is not directed at the party who claims aggrievement is not controlling. We have recently held that a party "may legitimately claim to have been adversely affected by an administrative . . . action without having been the person to whom the order is directed." *Kelly* v. *Freedom of Information Commission,* 221 Conn. 300, 311, 603 A.2d 1131 (1992).

What is particularly significant is that CHHC would be required to consider the fact that it had already granted the defendants a certificate of need in a limited service area if it were asked to reconsider the plaintiffs' application. In *Commission on Hospitals & Health Care* v. *Stamford Hospital,* 208 Conn. 663, 668–69, 546 A.2d 257 (1988), this court held that "[General Statutes] § 19a-154 specifies a number of factors [CHHC] must consider in determining whether to approve a request for a new function or service. These factors include the availability of such service or function at other inpatient rehabilitation facilities . . . within the area to be served, the need for such service or

an inventory cannot be issued, the foregoing [report] indicates that inpatient rehabilitative services may be provided in many alternative settings, e.g., acute care hospital exempt units as well as non-exempt units, rehabilitation hospitals (in Connecticut these hospitals are licensed as chronic disease hospitals), and skilled nursing facilities." Commission on Hospital and Health Care Investigation of Rehabilitative Services, Docket No. 91-10066RES, May 1, 1991, p. 18.

function within such area, and other factors that the commission deems relevant to the decision."

Furthermore, and of great significance, CHHC designated the plaintiffs a "party" to the consolidated proceedings. "While the plaintiffs' status as parties at the agency level does not constitute aggrievement; *Bakelaar* v. *West Haven*, [193 Conn. 59, 66, 475 A.2d 283 (1984)]; the trial court should have closely reviewed this administrative finding because many of the elements considered by the agency in granting this status closely track the elements that the court would have to find to determine whether a party is aggrieved." *Light Rigging Co.* v. *Department of Public Utility Control*, 219 Conn. 168, 178, 592 A.2d 386 (1991).

The majority misconstrues our recent decision in *Unisys Corporation* v. *Department of Labor*, 220 Conn. 689, 600 A.2d 1019 (1991). In *Unisys Corporation*, a unanimous court recognized that the plaintiff would have established a specific personal and legal interest to challenge the state's award of a contract to a "potential competitor" if the plaintiff could show that it would have submitted a bid but for the single source specifications. Id., 694–95.[6] The present case is far more compelling than *Unisys Corporation*. The plaintiffs in this case were more than potential competitors; they were actual competitors seeking a certificate of need from CHHC. Hartford Hospital was an actual competitor in the business of operating rehabilitation beds. We should grant standing to the plaintiffs in this case on the basis of the public policy concerns that guided our decision

---

[6] "Accordingly, we conclude that the plaintiff in this case would have standing if it is able to prove that it would have submitted a bid on the RFPs [requests for proposals] but for the single source specifications, that its equipment and software is equivalent to that specified in the RFPs and that the restrictions of the single source specifications undermined the object and integrity of the competitive bidding process, or that there was proof of favoritism." *Unisys Corporation* v. *Department of Labor*, 220 Conn. 689, 695, 600 A.2d 1019 (1991).

in *Unisys Corporation* v. *Department of Labor,* supra. " ' "[T]he public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit *brought by one who suffers injury* as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a 'private attorney general.' " ' " Id., 694; *Scanwell Laboratories, Inc.* v. *Shaffer,* 424 F.2d 859, 864 (D.C. Cir. 1970).

The facts establish with certainty that (1) the plaintiffs have a specific personal and legal interest in the granting of the defendants' application for a certificate of need for rehabilitation beds in the service area in which they both operate, and (2) the plaintiffs' interest has been specially and injuriously affected by CHHC's granting of the defendants' application.

Even if we should view the aggrievement issue by focusing our lens *only on the application granted to the defendants,* as the majority does, the plaintiffs are still aggrieved. This court recently held in *Light Rigging Co.* v. *Department of Public Utility Control,* supra, 173, that a plaintiff could satisfy the first prong of the aggrievement test by demonstrating that it provided similar services that would be authorized by the agency granting the license.

That is precisely the case here. Although Hartford Hospital does not have a certificate of need, it does have ten rehabilitation beds, as acknowledged by CHHC.[7]

---

[7] A certificate of need is necessary only to establish a new facility or expand an existing facility; thus, the fact that Hartford Hospital does not have a certificate of need is inconsequential. See General Statutes §§ 19a-154 and 19a-155. In addition, CHHC acknowledged that there is no category for rehabilitation beds in Connecticut. The CHHC report states the following: "It must be noted that in Connecticut there is not a licensure category for rehabilitation beds; rather rehabilitation beds exist under several licensure categories. Beds located in the acute care hospitals (Mount Sinai Hospital, Saint Francis Hospital and Medical Center, Hartford Hospital

Given that the test under *Light Rigging Co.* v. *Department of Public Utility Control,* supra, is the supply of similar services, and that Hartford Hospital and the defendants provide the same service—rehabilitation beds—the test is clearly satisfied in this case. The majority never explains why the supply of similar services fails to satisfy the test in this case. Instead, the majority sidesteps the plaintiffs' claim by noting that Hartford Hospital was merely a coapplicant and that Hartford Hospital never claimed aggrievement on the basis of its existing rehabilitation beds. First, whether Hartford Hospital is aggrieved is not dependent upon its status as a coapplicant or as the sole applicant. The majority cites no authority for this unusual claim. Second, the plaintiffs unequivocally argue that they were in competition with the defendants. They claim aggrievement under *Light Rigging Co.* v. *Department of Public Utility Control,* supra, on the basis of their interest in being free from unfair competition.

The trial court did not reach the second prong of the aggrievement test, which merely requires the possibility of injury. The following facts more than establish the *possibility* that the plaintiffs' interest has been specially and injuriously affected by CHHC's granting of the defendants' application. As noted above, in granting the defendants' certificate of need, CHHC was required to consider the availability of rehabilitative services in the service area. General Statutes § 19a-154 (b).[8] This court held in *Light Rigging Co.* v.

and Newington Children's Hospital) are licensed as acute care beds, while beds located at New Britain Memorial Hospital and Gaylord Hospital are licensed as chronic disease beds."

[8] General Statutes § 19a-154 (b) provides in relevant part: "The commission shall make such review of a request made pursuant to subdivision (1), (2) or (3) of subsection (a) of this section as it deems necessary, including, in the case of a proposed transfer of ownership or control prior to initial licensure, such factors as, but not limited to, the financial responsibility and business interests of the transferee and the ability of the institution

*Department of Public Utility Control,* supra, 177, that since the statute required the agency "to consider public need for the services to be rendered by an applicant before granting a certificate . . . existing certificate holders are entitled to be free of competition for which no need has been shown." Hartford Hospital is presently authorized to provide ten rehabilitation beds, and it, too, is entitled to be free of competition for which no need has been shown. When CHHC ultimately granted the certificate of need to the defendants, there was at least a possibility that Hartford Hospital's ability to operate these beds would be injured. Although the defendants' certificate of need ostensibly did not add general hospital beds, it did in fact add twenty-seven *rehabilitation* beds to the service area.[9] This increases the number of rehabilitation beds by 23 percent, over the current total of 113 beds, and will undoubtedly affect Hartford Hospital's ability to market its ten beds. This is especially significant when one considers that there is presently only a 58 percent utilization rate.

By sustaining the trial court's decision on the issue of aggrievement and foreclosing the plaintiffs from a judicial review of CHHC's determination, the majority

---

to continue to provide needed services, or in the case of the introduction of an additional function or service, ascertaining the availability of such service or function at other inpatient rehabilitation facilities, health care facilities or institutions or state health care facilities or institutions within the area to be served, the need for such service or function within such area and any other factors which the commission deems relevant to a determination of whether the facility or institution is justified in introducing such additional functions or services into its program or increasing its staff."

[9] The certificate of need grants sixty rehabilitation beds to the defendants. In turn, it requires Mount Sinai Hospital Corporation to give up twenty-four rehabilitation beds and Saint Francis Hospital and Medical Center to give up nine rehabilitation beds, for a total of thirty-three rehabilitation beds. The certificate of need also reduces Mount Sinai Hospital Corporation's licensed capacity by twenty-seven beds, but these are general beds, not rehabilitation beds.

fails to give effect to our time honored rules regarding aggrievement for jurisdictional purposes. First, "[e]very presumption which favors the jurisdiction of the court should be indulged." *Tuccio* v. *Zehrung,* 164 Conn. 231, 232, 319 A.2d 406 (1973). Second, "standing is an examination of the parties, not the merits of the action." *Manchester Environmental Coalition* v. *Stockton,* 184 Conn. 51, 64, 441 A.2d 68 (1981). Third, aggrievement is established if there "is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." *O'Leary* v. *McGuinness,* 140 Conn. 80, 83, 98 A.2d 660 (1953). Instead, the majority uses aggrievement as a bolt on the doors of the courthouse to exclude the plaintiffs from a review of CHHC's decision and thereby deprives the public of a "private attorney general" who could vindicate their rights by assuring that these health care services are delivered in a cost effective and efficient manner. The real losers today are the public. I would reverse the decision of the trial court and remand the case for a hearing on the merits of the plaintiffs' appeal.

## II

### THE PLAINTIFFS' CASE FOR A CERTIFICATE OF NEED (14617)

Although CHHC is authorized to conduct an investigation to determine the availability, efficacy, and cost-effectiveness of rehabilitative services in Connecticut hospitals; General Statutes § 19a-149; the investigative report should not have been entered into evidence, over the plaintiffs' objection, in considering their application for a certificate of need. Due process, which entails fundamental fairness, is not left outside the door just because it is an administrative hearing. "Due process of law requires that the parties involved [in an administrative proceeding] have an opportunity to know the

facts on which the commission is asked to act, to cross-examine witnesses and to offer rebuttal evidence." *Pizzola* v. *Planning & Zoning Commission,* 167 Conn. 202, 207, 355 A.2d 21 (1974); *Jaffe* v. *Department of Health,* 135 Conn. 339, 346, 64 A.2d 330 (1949).

In the present case, Commissioner Farrell acted as both the investigator and the adjudicator in determining whether a certificate of need would be granted and to whom it would be granted. His conclusions about the accessibility and delivery of rehabilitative services, which he first made in the investigation and later entered into evidence as an adjudicator, were directly contrary to the plaintiffs' argument in support of their application. Since Farrell failed to grant the plaintiffs' application for party status in the investigation, the investigative report and his conclusions should not have been admitted into evidence in the hearing on the plaintiffs' application for two reasons.

First, the plaintiffs were not able to cross-examine the sources of the evidence because they were not given party status for the investigatory proceedings, notwithstanding their specific request. Not only does due process require that a party who will be affected be given the right to cross-examine a witness; *Pizzola* v. *Planning & Zoning Commission,* supra, 207; but General Statutes § 4-178 (5) also provides that "a party . . . may conduct cross-examinations required for a full and true disclosure of the facts." The majority would permit CHHC to avoid these constitutional and statutory safeguards merely by convening an investigatory proceeding and barring an interested party from participating in the investigation.

The majority rejects this claim because "the plaintiffs were given the opportunity to rebut the conclusions in the report and an opportunity to subpoena witnesses and cross-examine them regarding their

previous testimony." The plaintiffs point out, however, that contemporaneous cross-examination is essential for effective cross-examination. Moreover, cross-examination, to be effective, must occur before the investigating officer finalizes his conclusions. The touchstone of due process is the right to be heard at a meaningful time and in a meaningful manner under the fourteenth amendment to the constitution of the United States. *Armstrong* v. *Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965).

Second, and most important, is the fact that Farrell was both the investigating officer and the adjudicating officer. As the investigating officer, Farrell arrived at conclusions bearing on the certificate of need that are directly contrary to the plaintiffs' position. Nevertheless, the plaintiffs were never given a chance to be heard before he made his decision as an investigator. Farrell, later acting as the adjudicator on the plaintiffs' application, allowed his investigative report with all its findings and conclusions to be entered into evidence, thereby placing the plaintiffs in the awkward position of undermining his investigation in order to prove him wrong. This procedure turns a neutral adjudicator into one who has a stake in the proceedings— that is, the plaintiffs must assume the uphill burden of demonstrating to the adjudicator that his investigatory findings and conclusions, which were publicly announced, are wrong.

The legislature sought to avoid this danger by enacting General Statutes § 4-176e, which provides that "no individual who has personally carried out the function of an investigator in a contested case may serve as a hearing officer in that case . . . ." The majority avoids § 4-176e by employing a narrow reading of the statute. It would allow CHHC to avoid § 4-176e, as it did in this case, simply by declaring that the investigation is separate and distinct from the consideration of the

merits of any pending application and assigning a different docket number to the investigation. This conflicts with our longstanding rule of construction under which we "assume that the legislature intended to accomplish a reasonable and rational result." (Internal quotation marks omitted.) *Zapata* v. *Burns,* 207 Conn. 496, 507–508, 542 A.2d 700 (1988). Furthermore, the majority allows CHHC to do exactly the mischief that the legislature intended to avoid—that is, to have the same person be an investigator and adjudicator for the same matter. In construing a statute we "must avoid a consequence which fails to attain a rational and sensible result which bears most directly on the object which the legislation sought to obtain." *Builders Service Corporation* v. *Planning & Zoning Commission,* 208 Conn. 267, 276, 545 A.2d 530 (1988).

I would find that CHHC, under the circumstances of this case, should not have allowed the investigative report into evidence. Accordingly, I would remand this case to the trial court with instruction to sustain the appeal and remand it to CHHC for the purpose of affording the plaintiffs a hearing on their application for a certificate of need by an adjudicator other than Farrell.

I respectfully dissent.