[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 1577
In these four cases, each plaintiff has appealed from the final decision of the commissioner of the Department of Environmental Protection (DEP) rendered on February 10, 1993, granting the defendant Riley Energy Systems of Lisbon, Inc. (RESOL) a permit to construct a solid waste resources recovery facility (SWRRF) in the town of Lisbon pursuant to General Statutes 22a-208a. The commissioner also awarded related permits to RESOL for establishing a new air contaminant source pursuant to General Statutes22a-174(c), for discharging waste water pursuant to General Statutes 22a-430, and for diverting water pursuant to General Statutes 22a-368. The decision also contains the commissioner's determination, as a prerequisite for issuance of the SWRRF permit, that "such facility . . . is necessary to meet the solid waste disposal needs of the state and will not result in substantial excess capacity of resources recovery facilities . . . ." General Statutes 22a-208d
(a).
All the plaintiffs challenge the commissioner's determination that "there will be a need for approximately 400 tons per day (tpd) of additional resources recovery capacity by the year 1998," which was the basis of the decision to issue the SWRRF permit. (F.D. p. 25) The applicable statute, 22a-208d(a) provides: "On and after July 1, 1989, the commissioner . . . shall not issue a permit under 22a-208a to construct or expand a resources recovery facility unless said commissioner makes a written determination that such facility . . . is necessary to meet the solid waste disposal needs of the state and will not result in substantial excess capacity of resources recovery facilities. . . ." The commissioner used the year 1998 in determining whether there was a need for the Lisbon facility, because the process of approving and constructing a typical resources recovery plant may require five years from the date of the final decision, February 10, 1993.
In concluding that the Lisbon facility would be needed in 1998, the commissioner first calculated a waste generation rate for the entire state in that year of 8046 tpd of mixed municipal solid waste (MMSW), based on a rate of 0.86 tons per capita per year (tcy) and a projected CT Page 1578 Connecticut population of 3,428,100. He reduced this estimate by 2011 tpd in allowing for the effect of recycling programs in accordance with the twenty-five percent recycling goal established by the state solid waste management plan (SWMP) pursuant to General Statutes 22a-241a. This subtraction resulted in a finding that 6035 tpd of waste would still have to be disposed of at resources recovery facilities, incinerators and landfills. (Amended F.D., 2/10/93.)
The commissioner had previously found that in 1998 the resources recovery facilities in this state will be capable of handling 5030 tpd of MMSW, 110 tpd less than at the time of the hearings because of the probable closing of a facility in Windham. (F.D. 10/5/92 pp. 19-22) He also found that by 1998 the available landfill capacity would be approximately 500 tpd and incinerator capacity would be 129 tpd. Subtracting the total estimated capacity for disposal of MMSW from the estimated quantity to be disposed of, the commissioner concluded that "approximately 400 tpd of additional resources recover capacity still will be needed in the state in the year 1998." RESOL's proposed Lisbon facility will have a design capacity of 500 tpd but an average operating capacity of 425 tpd because it is not expected to operate more than 85 percent of the time.
In addition to their challenge to the commissioner's finding of a need for the proposed SWRRF in Lisbon as unsupported by the evidence, the plaintiffs contest several rulings on evidence made during the course of the DEP hearings. The defendants claim that none of the plaintiffs has been aggrieved and urge that the appeals be dismissed for lack of that jurisdictional prerequisite.
I. Aggrievement
A. Statutory Standing
In appealing from the commissioner's final decision, the plaintiffs have included in their verified complaints allegations of conduct which has, or which is likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state and thus claim statutory aggrievement pursuant to 22a-19. The intervening CT Page 1579 plaintiff, the town of Stonington, which was not a party to the administrative proceeding, has filed a verified petition to intervene containing similar allegations on the basis of which this court has previously allowed it to intervene.
The only plaintiff whose statutory aggrievement under22a-19 has been attacked is the Southeastern Connecticut Regional Resources Recovery Authority (SCRRA), which is a regional resources recovery facility created pursuant to General Statutes 7-273aa — 7-273pp and comprised of the towns of East Lyme, Griswold, Groton, Ledyard, Montville, New London, North Stonington, Norwich, Sprague, Stonington, and Waterford. SCRRA operates a resources recovery facility in the town of Preston. The defendant RESOL claims that because SCRRA did not rely on 22a-19(a) when it intervened in the administrative proceeding pursuant to General Statutes 4-177a, it cannot assert statutory standing to support its appeal simply by including the allegations specified in 22a-19(a) in its verified complaint. (F.D. p. 12; P.D. p. 5) RESOL argues that SCRRA could have obtained statutory standing only if it had intervened in the appeal of one of the other plaintiffs pursuant to 27a-19(a) or had initiated a separate action for declaratory and equitable relief pursuant to General Statute 22a-16.
Although 22a-19(a) by its terms provides only for intervention in an administrative proceeding or judicial review thereof, the court in Mystic Marinelife Aquarium, Inc. v. Gill, 175 Conn. 483, 489 (1978), construed the statute liberally to provide a right of appeal to a plaintiff which could not have intervened in any pending appeal. "One basic purpose of the EPA is to give standing to bring actions to protect the environment. . . . A statute is not to be interpreted to thwart its purpose." Id. In Mystic, however, the plaintiff had been allowed to intervene in the administrative proceeding upon filing a verified pleading pursuant to 22a-19(a). SCRRA filed no such document at the DEP hearings in this case, but was permitted to intervene pursuant to General Statutes4-177a, presumably on the ground that its petition to intervene stated "facts that demonstrate that the petitioner's participation is in the interests of justice and will not impair the orderly conduct of the CT Page 1580 proceedings.
In Red Hill Coalition, Inc. v. Conservation Commission,212 Conn. 710, 715-16, (1989), the court expanded its liberal construction of 229-19(a) to find statutory standing for two plaintiffs who had not intervened in the administrative appeal but had joined in the appeal of a third plaintiff, which had intervened by filing the requisite verified pleading at the administrative level. "Steffens and Fitzgerald satisfied [22a-19(a)] by joining the coalition's appeal to the Superior Court. They were not required to file a notice of intervention before the commission." Id., 716. Despite this precedent, RESOL maintains that SCRRA cannot initiate an appeal of its own on the basis of 22a-19(a) because of its failure to claim statutory standing before the agency. In permitting persons who never even participated in the administrative proceeding to join in an appeal from the agency decision, however, the Red Hill court implicitly found that such persons had "an interest in the subject of the action" or possessed a "right of relief in respect to or arising out of the same transaction" as Practice Book 83 and 84 require for joinder of plaintiffs. Such an interest or right of relief was, of course, the statutory standing conferred by 22a-19(a), which was found to exist for each of the three plaintiffs.
On the basis of Mystic and Red Hill this court concludes that SCRRA may maintain its appeal on the basis of its verified complaint containing the allegations prescribed by 22a-19 concerning the likelihood of unreasonable pollution, impairment or destruction of the "public trust in the air, water or other natural resources of the state." From the viewpoint of judicial policy, little purpose would be served by excluding persons who had been allowed to participate in the administrative proceeding without filing the pleading required by22a-19(a) from judicial review of the agency determination. Such a holding would only lengthen the paper trail created by an administrative appeal with motions to intervene in the appeals of other parties or lead to the initiation of separate actions for declaratory and equitable relief pursuant to 22a-16.
The issue of the statutory standing of SCRRA to CT Page 1581 maintain its appeal is probably academic as a practical matter. The same issues that it is entitled to raise, which are limited to environmental concerns, can be and have been raised by the plaintiffs in the other three appeals. If the plaintiffs prevail in any of the appeals, the same relief would be granted. The determination of the court that SCRRA has statutory standing would be significant only in the unlikely event that it will be the only party seeking to appeal from the judgment of this court.
B. Classical Aggrievement
As an additional basis for standing, the plaintiffs CRRA and SCRRA claim actual aggrievement in the award of the SWRRF permit for the Lisbon facility, i.e. "a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole," as well as harm to that interest. Nader v. Altermatt,166 Conn. 43, 51 (1974). The plaintiff Norwich has alleged that it is aggrieved by the final decision (27) but the only basis alleged for its aggrievement, apart from the air pollution that provides its statutory standing, is its potential liability, as a member town of SCRRA, for any deficit that authority may incur because of the increased competition for waste resulting from construction of the Lisbon plant.[1] The complaint of the plaintiff Stuart Greenfield et al alleges only statutory aggrievement, as does the intervening motion of the plaintiff Stonington. The only evidence pertaining to aggrievement of any of the parties is that contained in the record of the agency proceeding. RESOL claims that none of the plaintiffs has established classical aggrievement.
Both CRRA and SCRRA rely upon Light Rigging Co. v. Department of Public Utility Control, 219 Conn. 168 (1990) for support of their claims of classical aggrievement. That case held that motor carriers holding certificates of public convenience and necessity were aggrieved by the issuance of such a certificate to a potential competitor, because the statute involved required consideration of "the existing motor transportation facilities and the effect upon them of granting such certificate, [and] the public need for the service the applicant proposes to render." CT Page 1582 General Statutes (Rev. to 1985) 16-286. "Because 16-286 expressly requires the DPUC to consider public need for the services to be rendered by an applicant before granting a certificate, however, existing certificate holders are entitled to be free of competition for which no need has been shown." Id., 177.
The parallel provisions of the Solid Waste Management Act are 22a-208d(a) which requires a "determination that such (SWRRF) facility . . . is necessary to meet the solid waste disposal needs of the state and will not result in substantial excess capacity of resources recovery facilities"; 22a-208d(c)(1)(I), which requires "[a] demonstration that the throughput capacity of the proposed facility, when combined with the throughput capacity of all other resources recovery facilities . . ., shall not exceed the total throughput capacity of resources recovery facilities . . . needed to process waste generated in the state. . . ."; and 22a-208d(c)(2), which requires the commissioner to consider "the current and anticipated availability of throughput capacity for mixed municipal solid waste at resources recovery facilities."
Although these provisions lack an express direction to consider the effect of licensing a new SWRRF upon existing facilities, as in Light Rigging, they may reasonably be construed to include that purpose. Both CRRA and SCRRA, though not to be "construed to be a department, institution or agency of the state,"; General Statutes 22a-261(a); are statutory creations for the purpose of performing public functions whose finances are enhanced by special tax exemptions; General Statutes 22a-270, 22a-275(f); and a pledge by the state not to alter the rights of bond holders. General Statutes 22a-274. "Upon termination of the existence of the [CRRA] all its rights and properties shall pass to and be vested in the state of Connecticut." General Statutes 22a-261(1). One of the purposes the legislators probably had in mind in directing the commissioner to consider the capacity of existing SWRRF facilities when making a determination of need was the financial impact on those facilities of a new competitor for municipal waste, because the state has a significant interest in maintaining the financial viability of these SWRRF facilities operated by CRRA or by municipal or regional authorities pursuant to General Statutes 22a-275. CT Page 1583
The federal courts have abandoned the "legal right" test of standing established in Tennessee Electric Power Co. v. TVA, 306 U.S. 118 (1937) and have generally accorded standing to those whose interests are adversely affected by an agency decision, provided that such interest is "arguably within the zone of interests to be protected or regulated by the statute . . . in question." Data Processing Service v. Camp, 397 U.S. 150, 153 (1970). "The new law is that one who has an interest in freedom from competition has standing to challenge new competition." Davis, Administrative Law Treatise (2d ed.) 24:13. "The (zone of interests) test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff." Clarke v. Securities Industry Assn., 479 U.S. 388, 399-400 (1987).
In disputing the standing of CRRA and SCRRA, RESOL relies on the recently decided case of New England Rehabilitation Hospital of Hartford, Inc. v. CHHC,226 Conn. 105 (1993), in which standing to appeal the grant of a certificate of need for a rehabilitation hospital in the Hartford area to one applicant was denied to a second applicant, both applications having been heard jointly by the commission on hospitals and health care. The court, did not overrule Light Rigging and even cited with apparent approval several federal cases, including Association of Data Processing Services and its "zone of interests" test of standing. Those cases, however, were distinguished on the ground that the aggrieved plaintiffs were already engaged in the business into which the new competitors sought entry through the grant of agency approval. Id., 125-26. Light Rigging was distinguished as a case involving "existing certificate holders who are entitled to be free of competition for which no need has been shown." The second applicant for a rehabilitation hospital license was held not to be an existing competitor, "whose present business operations either are adversely affected by [the agency's] decision granting the [first applicant's] certificate of need, or are within the zone of interests to be protected by a particular state statute or constitutional guarantee." Id., 126.
It is indisputable that both CRRA and SCRRA are existing competitors for solid waste that is used as fuel CT Page 1584 to generate electricity that is sold to utility companies. The Lisbon plant will undoubtedly reduce the availability of waste for each of these plaintiffs, the impact being greatest upon SCRRA, whose plant in Preston is operating well below its capacity for lack of sufficient waste. Although the statutory language of the subsections of22a-208d referenced previously is less specific than that demanding consideration of the effect upon existing facilities of granting a new permit in Light Rigging, it is reasonable to construe the concern over excess capacity expressed in 22a-208d as affording protection to the economic interests of statutory authorities performing governmental functions, such as CRRA and SCRRA, which are engaged in operating SWRRF plants. Those authorities do have interests that fall within the zone of interests intended to be safeguarded by the statute and both, therefore, are classically aggrieved.
Norwich, which is one of the eleven municipalities comprising SCRRA, is one step removed from that agency, which the court has found to be classically aggrieved. As the sole basis for its aggrievement, it has pleaded that it would be liable for its share of any deficit SCRRA may suffer because of increased competition from the proposed Lisbon plant. It has not, however, briefed its claim of aggrievement nor has it been admitted by any defendant. The only brief Norwich has filed in this court is a copy of the brief filed in the DEP proceeding discussing the impact in Norwich of the increased garbage truck traffic likely to be generated by the Lisbon facility. There is an insufficient basis in the record before the court to find that Norwich is classically aggrieved. As previously mentioned, the plaintiffs Stuart Greenfield et al and the intervening plaintiff Stonington have not pleaded classical aggrievement nor is it claimed in their briefs.
The only significance of the court's finding of classical aggrievement with respect to CRRA and SCRRA is that those plaintiffs are entitled to raise not only environmental issues, which are available to all plaintiffs by virtue of their statutory aggrievement, but also any other issue that might result in a reversal or modification of the commissioner's decision. Although this discussion of classical aggrievement is necessary, because it involves jurisdiction over the subject matter, it is largely CT Page 1585 academic. All of the issues raised by the plaintiffs involve environmental concerns and could be raised simply on the basis of their statutory standing.
II. Determination of Need
A. Standard of Review
All the plaintiffs attack the commissioner's determination that the proposed Lisbon SWRRF "is necessary to meet the solid waste disposal needs of the state and will not result in substantial excess capacity of resources recovery facilities," a requirement for issuance of a permit imposed by 22a-208d(a). They claim that the commissioner's conclusion that there will be a need for approximately 400 tpd of additional SWRRF capacity by 1998 is not adequately supported by the evidence. Such a claim, according to precedent in this state, is to be examined under the substantial evidence standard of review. "This so-called substantial evidence rule is similar to the `sufficiency of the evidence' standard applied in judicial review of jury verdicts, and evidence is sufficient to support an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred." Huck v. Inland Wetlands Watercourses Agency,203 Conn. 525, 541 (1993). A more elaborate statement of the rule appears in the recent decision of DeBeradinis v. Zoning Commission, 228 Conn. 187, 198-200 (1994).
The plaintiff Stonington urges that we adopt a different standard of review with respect to agency decisions involving environmental issues and suggests that the court follow the Michigan Supreme Court, which has employed a de novo standard of review in cases arising under the Michigan environmental protection act. In West Michigan Environmental Council v. National Resources Commission, 405 Mich. 741 275 N.W.2d 450 (1979), the court construed the Michigan parallel of our General Statutes22a-16 to require that, in an independent action for declaratory and injunctive relief to protect the public trust in natural resources, the issue of whether the alleged pollution will impair such resources must be determined by a judge de novo without deference to any prior agency decision on that subject. Section 22a-16
differs significantly from the Michigan statute, however, CT Page 1586 in that it contains no provision that "specifically indicates that the usual standards for review of administrative actions under the Administrative Procedures Act are inapplicable once an environmental protection act case has been filed in a circuit court," as did the Michigan statute. Id.
We need not consider the import of subparagraph (c) of22a-18, which provides that, after a remand to an agency under subparagraph (b) of that section during the course of an action under 22a-16, "[i]f the agency's consideration has not been adequate, and notwithstanding that the agency's decision is supported by competent material and substantial evidence on the whole record, the court shall adjudicate the impact of the defendant's conduct on the public trust in the air, water or other natural resources of the state. . . ." The present proceeding is not an action pursuant to 22a-16 but an administrative appeal authorized by General Statutes 4-183. Subparagraph (j) of 4-183
prescribes the standard of review for such an appeal: "The court shall not substitute its judgment for that of the agency on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative finding, inferences, conclusions, or decisions are: . . . (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. . . ." The statute effectively endorses the substantial evidence standard of review and creates no exception for environmental issues. The decisions of the Connecticut supreme court have consistently applied that standard in reviewing administrative determinations of environmental issues. Starr v. Commissioner of Environmental Protection, 226 Conn. 358, 371 (1993); Gardner v. Conservation Commission, 222 Conn. 98, 108-09
(1992); Mystic Marinelife Aquarium, Inc. v. Gill, 175 Conn. 483,500-03.
B. Quantity of Connecticut Waste in 1998
The commissioner's determination of need for RESOL's proposed SWRRF is based on his finding that by 1998 this state will generate 6035 tpd of solid waste to be disposed of, while the available disposal capacity by that date will be only 5659 tpd, resulting in a capacity shortage of CT Page 1587 approximately 400 tpd. The plaintiffs focus their attack mainly on the commissioner's estimate of the quantity of waste to be generated by 1998. The plaintiff CRRA also challenges his capacity finding on the ground that evidence that one of its facilities had a greater operating capacity than found by the commissioner was excluded when it was offered in a post-hearing motion.
It is indisputable that any additional SWRRF, such as the Lisbon facility will necessarily increase the quantity of pollution contaminating the atmosphere in this state and thus impair the "public trust in the air" declared by General Statutes 22a-15. The regulatory plan, therefore, requires a permit for the disposition of solid waste and allows the issuance of such a permit only when it is "necessary to meet the solid waste disposal needs of the state and will not result in substantial excess capacity of resources recovery facilities." General Statutes 22a-15,22a-208c, 22a-208d(a).
One purpose of the prohibition against SWRRF capacity that exceeds the waste disposal needs of this state is to limit the quantity of waste from other states that would otherwise be imported and disposed of here, thus increasing our level of pollution. Attempts by a state that has licensed a waste disposal facility to preclude its use for the disposal of waste imported from other states have been invalidated as violative of the commerce clause of our federal constitution. Chemical Waste Management, Inc. v. Hunt, 112 S.C. 2009 U.S. (1992); Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources,112 S.C. 2019 U.S. (1992). The evidence presented at the administrative proceeding indicated that approximately 300,000 tons of waste (CRRA 7/16/93 p. 15-16) per year were being imported from out of state by Connecticut disposal facilities. This annual rate of disposition of imported waste is equivalent to 822 tpd and substantially exceeds the 400 tpd deficit in disposal capacity predicted by the commissioner for 1998. The hearing officer who first considered RESOL's application concluded that there was a "glut" of SWRRF capacity and that the existing facilities should be fully utilized by "displacing the large amounts of out-of-state MMSW presently being disposed of in our state" before any new SWRRF should be licensed. That determination, however, was overturned by the CT Page 1588 commissioner's designated final decision maker.
The specific flaws claimed by the plaintiffs in the commissioner's determination of need are: (a) the contracts with the municipalities that are to supply waste to the Lisbon facility indicate that a reasonable alternative to the establishment of another source of pollution exists; (b) evidence that existing facilities had greater operating capacity for waste disposal than found by the commissioner was improperly excluded; (c) in calculating the rate of waste generation used in determining need, the commissioner failed to consider "source reduction" as a factor that would reduce such rate; (d) the commissioner relied on unreliable hearsay evidence in making his determination; and (e) the opinion of the commissioner's final decision maker fails to comply with a statutory requirement for separate statements of findings of fact and conclusions of law.
a) Reliance on HRRA Contracts
An applicant for a SWRRF permit is required to provide, inter alia, an estimate of "mixed municipal solid waste generated by and received from each municipality and other customers that will send waste to the facility, in tons per day evidenced by contracts or letters of intent" General Statutes 22a-208d(c)(1)(D)(i). The first proposed decision on RESOL's application, issued on February 28, 1992, did not make a determination of need because the letters of intent submitted in support of the application were deemed inadequate and RESOL was required to present signed contracts to show that it would have sufficient waste to equal the operating capacity of the proposed Lisbon facility. (F.D. 2/28/92, pp. 39-40)
In order to comply with that directive RESOL, at the second administrative proceeding, presented executed contracts between its parent corporation, Wheelabrator Environmental Systems, Inc., and the Housatonic Resources Recovery Authority (HRRA) and also with the eleven municipalities comprising its membership, Bethel, Bridgewater, Brookfield, Danbury, Kent, New Fairfield, New Milford, Newtown, Redding, Ridgefield and Sherman. RESOL anticipates that the HRRA towns will supply 365 tpd of MMSW to the Lisbon facility. The contracts, however, require CT Page 1589 only that those towns deliver their waste to a transfer station to be located in the greater Danbury area. They do not provide that it must be delivered or disposed of at the proposed Lisbon plant. (F.D. 6/23/92, p. 18) The contracts, which vary in duration from twenty-two to thirty years, will remain in effect whether or not the Lisbon facility is built. Wheelabrator is able to provide this assurance because it owns a SWRRF in Bridgeport that has been disposing of 123,000 tons of out-of-state waste per year or 337 tpd. An additional 130,000 tons of out-of-state waste, or 356 tpd, were being delivered to a landfill in New Milford owned by Waste Management Company, which owns Wheelabrator.
Recognizing that RESOL's cost of transporting waste over the 21 miles between Danbury and Bridgeport would be much less than the cost of transporting it approximately 100 miles from Danbury to Lisbon, the second proposed decision issued on June 23, 1992, recommended that, if a permit should be granted, a condition be imposed requiring that the HRRA waste "be sent to Lisbon unless and until it is displaced by other Connecticut waste." (Id. p. 18) RESOL had indicated its willingness to accept such a condition. As previously noted, however, that decision recommended that a determination of need not be issued because of the existing "glut" of SWRRF capacity and the likelihood that such a need would not exist "until the year 2000." (Id. p. 25) The final decision, issued on October 5, 1992, which found that a shortage of waste disposal capacity in this state would occur in 1998 and, on that basis, determined that the Lisbon facility was needed, adopted the recommendation for a permit condition requiring RESOL to dispose of all waste received from the HRRA towns at the Lisbon facility, unless such waste is displaced by other Connecticut waste. (F.D. 10/5/92, p. 35)
The plaintiff CRRA claims that the permit condition does not provide adequate assurance that the HRRA towns "will send waste to the facility," as 22a-208d(c)(1)(D)(i) contemplates and the final decision assumes. It points out that the HRRA contracts are with Wheelabrator, not with RESOL, and maintains that the separate identity of the two corporate entities cannot be disregarded simply because of their parent-subsidiary relationship. CT Page 1590
The court concludes, however, that, even if there were no affiliation between RESOL and Wheelabrator, the permit condition would be enforceable against RESOL. A breach of the condition, which constitutes an agreement with the state, would ordinarily[2] warrant such equitable relief as a decree of specific enforcement or revocation of the permit, as well as damages.
The CRRA also claims that the HRRA contracts do not establish a need for the Lisbon facility because they contain provisions obliging Wheelabrator to dispose of the waste delivered by the HRRA towns whether or not the Lisbon plant is built. A similar claim is made with respect to RESOL's contracts with Middletown for 90 tpd and with Lisbon for 5 tpd, which were also presented at the second proceeding. Middletown presently is disposing of its waste at the CRRA's mid-Connecticut SWRRF pursuant to a ten year option contract. That facility has adequate capacity to dispose of Middletown's waste for ten years beyond the present option contract. Lisbon's needs can easily be accommodated at the mid-Connecticut plant or at the SWRRF owned by the plaintiff SCRRA in Preston, which has substantial unutilized capacity and is encountering problems as a result of a shortage of waste.
Section 22a-208d does not refer to the needs of individual municipalities, however, but to the "solid waste disposal needs of the state." The commissioner's final determination of need is based on a calculation of the needs of the whole state by 1998. If that calculation is correct, the quantity of waste generated in this state will exceed the disposal capacity then available by 400 tpd. The fact that the HRRA communities have Wheelabrator's guaranty that their waste will be disposed of by Wheelabrator or that Middletown has an option to continue to use the mid-Connecticut facility does not necessarily undermine the commissioner's determination of need. If his prediction of a shortage of disposal capacity by 1998 is sound, all of the current disposal capacity will be fully utilized by that date. The fact that there is presently a "glut" of such capacity in Connecticut, as found by the first hearing officer, does not vitiate the finding of the final decision maker that there will be a shortage in 1998 without the Lisbon plant. CT Page 1591
b) Exclusion of Additional Evidence of Increased Capacity of Mid-Connecticut Facility.
After the final decision maker had issued his decision of October 5, 1992, which rejected the conclusion reached by the June 23, 1992 proposed decision that a determination of need not be issued because of the existing "glut" of SWRRF capacity and the large amounts of out-of-state waste being disposed of, CRRA and SCRRA filed requests for reconsideration of new data on recycling and solid waste disposal and also additional evidence concerning the operating capacity of CRRA's mid-Connecticut plant and SCRRA's Preston facility. The final decision maker granted reconsideration for the limited purpose of considering new evidence on recycling and waste disposal but refused reconsideration of the proffered evidence of increased capacity on the ground that the petitioners "did not show good cause why such information was not presented earlier during the agency proceedings." (F.D. 2/10/93 p. 2.) Following the limited reconsideration hearing, the amended final decision of February 10, 1993, from which these appeals were taken, revised the October 5, 1992 prediction of the 1998 shortage from 460 tpd to 400 tpd.
Section 4-181a(a)(1)(B) provides that "a party in a contested case may . . . file with the agency a petition for reconsideration of the (final) decision on the ground that: . . . (B) new evidence has been discovered which materially affects the merits of the case and which for good reasons was not presented in the agency proceeding;. . . ." The October 5, 1992 decision employed an estimated operating rate of 85 percent for all Connecticut SWRRF plants in calculating their currently available capacity. This rate was higher than the 82 percent estimate of the February 1991 Solid Waste Management Plan (SWMP) but lower than the 90 percent operating rate claimed by CRRA and SCRRA. The decision cited as one reason for rejecting the claim of CRRA to a higher operating rate for its facilities, the testimony of a CRRA witness admitting there was no evidence that its mid-Connecticut plant had ever operated at the 90 percent level for any significant period of time. A claim of SCRRA to a 93 percent rate for its Preston plant was also rejected.
The evidence that CRRA proposed to offer at the CT Page 1592 reconsideration hearing was that, after the completion of improvements to its mid-Connecticut facility in May, 1992, costing $20,000,000, that plant had operated at an average rate of 60,000 tons per month or approximately 2,000 tpd from June through September, 1992, approximately 275 tpd more than the decision assumed. The evidence to be offered concerning the Preston facility of SCRRA was the opinion of a professional engineer furnished on September 29, 1992 that this plant, with certain improvements, could dispose of 690 tpd of waste rather than 600 tpd as the decision concluded. The increase in operating rates for both facilities would result in a claimed total increase in SWRRF operating capacity of 365 tpd, which would greatly reduce the October 5, 1992 finding of a need for 460 tpd of additional capacity.
CRRA and SCRRA argue that the reason given by the final decision maker for refusing to consider this evidence, that no good cause was shown for not presenting it earlier, indicates an abuse of discretion. They claim that such evidence was not available during the proceedings that resulted in the June 23, 1992 decision and did not exist until September 1992, after that decision had been rendered and the oral argument proceeding conducted by the final decision maker on July 9, 1992, which preceded the October 5, 1992 decision, had concluded.
Although the specific evidence recited in the reconsideration request was not available until September, 1992, substantially similar evidence could have been offered before the October 5, 1992 decision was issued. According to the chart (Attachment C) submitted with the request for reconsideration, CRRA's mid-Connecticut facility reached operating levels of 1,897 tpd in May, 1,994 tpd in June, 2,084 tpd in July, 1,954 tpd in August and 1,943 tpd in September. These figures approximate the 2,000 tpd operating capacity claimed in the request. The May and June figures could have been presented at the proceeding before the final decision maker on July 9, 1992, and a request to present all of the data could have been filed prior to issuance of the October 5, 1992 decision.
With respect to the opinion of the expert concerning the potential increase in the operating rate of the SCRRA facility in Preston, the briefs of the parties disclose no CT Page 1593 reason why the opinion of the expert contained in a letter dated September 29, 1992, could not have been presented earlier or why a similarly qualified witness could not have been available for the hearings preceding the June 23, 1992 proposed decision.
In fact, both CRRA and SCRRA presented expert witnesses at the earlier hearings on the subject of operating rates of SWRRF plants. The witnesses, Martin and Wills, testified that existing resources recovery facilities could operate at a 90 percent level. The agency staff maintained, however, that such a rate was unlikely over the life of such plants because of maintenance and operational problems as the facilities aged. The hearing officer believed their testimony and that of others to the same effect because she used a 90 percent availability rate in concluding in the June 23, 1992 decision that there was no need for the Lisbon facility.
The final decision maker, however, concluded that the 90% rate was improbable over the life of an SWRRF plant. he also disagreed with the recommendation of the agency staff that an 82% rate, as suggested in the SWMP, should be used. He chose an 85% availability rate because CRRA guaranteed such a rate to its municipality customers and because such a rate "appears to reflect what the data shows plants in Connecticut are capable of operating at over time." F.D. 10/5/92, p. 19.
The court concludes that there was no abuse of discretion in the rejection of the additional evidence concerning the operating rates of the CRRA and SCRRA plants. There had been ample opportunity to present similar evidence at the earlier hearings and, in any event, to request that the proffered evidence or most of it be considered prior to the October 5, 1992 decision. The final decision maker could reasonably have concluded that CRRA and SCRRA had failed to offer "good reasons" for not presenting the additional evidence before the October 2, 1992 decision, as General Statutes 4-181(a)(1) requires of a petition for reconsideration.
c) Failure to Allow for Source Reduction in Calculating Need
Section 22a-228(b) of the statutes requires the CT Page 1594 defendant commissioner to adopt a SWMP that "shall establish specific goals for source reduction, bulky waste recycling and composting." This statute places source reduction first in the "order of priority for managing solid waste." Id. Section 22a-228(d) orders the commissioner to revise the SWMP "to include a source reduction component that outlines specific strategies to reduce the solid waste generated in this state by an amount not less than the amount required to maintain until the year 2010 the annual per capita solid waste generation rate at the rate estimated by the commissioner in 1988."
CRRA claims that the amended final decision makes no allowance for source reduction in calculating need, despite the priority of that method of reducing the quantity of waste generated, as recognized by 22a-228(b). Although no explicit reference to "source reduction" as a method of reducing the waste generation rate can be found in the decision, the calculation of need implicitly assumes that such a factor will prevent any increase in that rate in the interim between the decision and 1988, an assumption consistent with 22a-228(d) and the SWMP (SWMP, p. 15). The decision assumes a waste generation rate of 0.86 tons per capital per year (tcy) in calculating need. This rate is less than the 0.89 (tcy) rate estimated by the commissioner for 1988 pursuant to 22a-228(d). The lower rate was based on information that the quantity of waste delivered to the CRRA facilities throughout the state and to the SCRRA facility in Preston had "declined significantly since 1988." The decision recognizes some uncertainty as to whether the waste generation rate has actually declined or the recycling rate has increased. The final decision maker, however, was convinced that the waste generation rate had declined by 0.03 tcy. His finding indicates that he did consider source reduction as a factor that had reduced the waste generation rate since 1988, because he made a separate allowance for recycling in his calculation of need. (F.D. 10/5/92, p. 14.)
Furthermore, the SWMP refers to an estimate of the federal Environmental Protection Agency that the growth rate for municipal waste is 0.8 percent per year. Section22a-228(d) defies this prediction by mandating that "strategies" be adopted so that the 1988 rate of 0.89 tcy for waste generation in this state will not be exceeded. CT Page 1595 In making his calculation that approximately 8046 tpd of waste will be generated in 1998, the final decision maker simply multiplied his 0.86 tcy waste generation rate estimate, which was based on current data, by his population estimate for 1998 of 3,428,100. He made no allowance for growth in the waste generation rate or an increase in the recycling rate beyond the 25 percent goal set forth in the SWMP, which he used in his calculation of need. He may well have assumed that the statutory restriction of growth in the waste generation rate would be complied with by means of source reduction as well as recycling.
d) Reliance Upon "Unidentified Connecticut Waste" Data Supplied by RESOL's Parent Companies
At the hearing on reconsideration of the October 5, 1992 decision, the agency staff submitted solid waste tonnage data for the period July 1, 1991, through June 30, 1992, which General Statutes 22a-208e requires each resources recovery facility and each solid waste disposal area to report quarterly, including "the amount of solid waste . . . received from each municipal or other customer" and "for each Connecticut municipality the total amount of solid waste originating therefrom." Despite this statutory mandate for disclosure of the sources of the waste delivered to such facilities, the exhibit listing the tonnage data prepared by the staff contains an item entitled "Unidentified-Conn" amounting to approximately 442,000 tons for the year commencing July 1, 1991. Although most of the reporting facilities included some quantities of unidentified Connecticut waste in their reports, the Bridgeport affiliate and the New Milford landfill operated by a Waste Management affiliate, reported a combined quantity of 265,000 tons, approximately 60 percent of the total, and equivalent to 726 tpd.
CRRA and SCRRA argue that the disproportionately large amount of unidentified Connecticut waste reported by these two Waste Management affiliates while the application for the Lisbon facility by RESOL, another such affiliate, was pending, raises serious questions about the reliability of the information furnished. If the 726 tpd of unidentified Connecticut waste did not in fact originate in this state, the final decisions maker's finding of a need for an CT Page 1596 additional 400 tpd of SWRRF capacity would be unsupported by the evidence.
At the reconsideration hearing before the final decision maker an December 10, 1992, SCRRA requested that RESOL be ordered to provide "a breakdown by municipality of the waste which is claimed to be unidentified Connecticut waste. CRRA joined in the request. A similar request had been made at the hearing preceding the June 23, 1992 decision, which the hearing officer denied on the ground of irrelevancy. That ruling, however, was harmless in view of the conclusion she reached that there was no need for the Lisbon facility. At the reconsideration hearing, however, the final decision maker, after conferring with agency counsel, denied the request. CRRA and SCRRA claim that this ruling was erroneous and prejudicial.
During the testimony that preceded the ruling, members of the staff who had prepared the exhibit showing the waste attributed to various towns and containing the "Unidentified-Conn" listing were cross-examined. They testified that the exhibit was compiled on the basis of the quarterly reports received from Connecticut waste disposal facilities pursuant to 22a-208e. The reports, however, did not always assign quantities of waste to each town in which it has been generated because sometimes the waste from several towns was reported as a single total. For this reason the exhibit included the category "Unidentified-Conn," which indicates by month and year the amount of waste reported by an SWRRF as Connecticut waste but not attributed to a particular town.
With respect to the reports received from Waste Management's affiliate, RESCO, concerning its SWRRF in Bridgeport, a staff witness testified that its report "tells us we got so much from spot tonnage. They break down part of that spot tonnage by town, including out-of-state towns. And then they have another thing that's called "other spot." For that other spot, they've broken down how much of that came from out of state on a separate report that we've requested." Another staff witness testified that the RESCO reports "indicate communities and tonnages and then they indicate some towns where they don't indicate the tonnage that came from those towns." CT Page 1597
A staff witness also testified that the agency's calculation of the amount of unidentified Connecticut waste processed at RESCO's Bridgeport facility was made by subtracting from the quantity of "other spot waste" in its report, i.e. waste not attributed to named towns, the tonnage of out-of-state waste stated in a letter from the RESCO operations manager dated August 3, 1992, in response to an inquiry from the agency.
The court concludes that the ruling denying the motion for a breakdown by municipality of the waste tonnage included as unidentified Connecticut waste in the reports from RESCO plant in Bridgeport was within the discretion of the final decision maker. He could reasonably have concluded from the testimony that any further breakdown than that obtained by the agency staff would be unavailable because many trucks collected garbage from several towns. The requirement of 22a-208e for a breakdown by municipality is not inflexible, as it provides that, "[i]f precise data are not available, the owner or operator may use a method of estimating acceptable to the commissioner.
With respect to the claim that the reports from the Waste Management affiliates were unreliable hearsay, it must be recognized that hearsay evidence is not automatically excluded in administrative proceedings. Those reports would qualify as business records from their appearance. The letter from RESCO, which was solicited by the staff, was actually introduced in evidence by SCRRA without any objection and can form no basis for finding error.
e) Failure to State Findings and Conclusions of Law Separately
General Statutes 21-183(g) directs a state agency, after an appeal has been filed, to transmit to the reviewing court the entire record of the proceeding, "which shall include the agency's findings of fact and conclusions of law, separately stated." A cursory examination of the final decision in this appeal indicates adequate compliance with the statute. The CRRA brief that raises this claim does not pinpoint any specific deficiencies in the statements of factual findings and legal conclusions, nor does it suggest how the alleged noncompliance has prejudiced the presentation of the appeal. CT Page 1598
The court concludes that this ground for sustaining the appeal is entirely without merit and warrants no further discussion.
III. Invalidity of Permit Condition
None of the parties has briefed the significant issue of whether the condition attached to the permit grant requiring RESOL to dispose of all solid waste from HRRA towns at the proposed Lisbon plant and that RESOL "shall only displace such waste by solid waste that it receives from other Connecticut towns." is invalid because it violates the commerce clause of our federal constitution by imposing an unjustifiable barrier to the importation of out-of-state waste into Connecticut. The CRRA brief cites the cases of Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Nat. Resources, supra, and Chemical Waste Management v. Hart, supra, for the proposition that a state cannot prohibit a waste disposal facility from accepting out-of-state waste when its supply of in-state waste is insufficient to operate at full capacity. Those cases, and their progenitor City of Philadelphia v. New Jersey,437 U.S. 617 (1978), however, stand for the broader proposition that, whatever the purpose of such a restriction, "it may not be accomplished by discriminating against articles of commerce coming from outside the [s]tate unless there is some reason, apart from their origin, to treat them differently." Id., 626-27.
In Philadelphia, the New Jersey statute found to violate the commerce clause effectively closed its borders to all but a few categories of waste from other states because of the growing scarcity of landfill sites within the state. In Fort Gratiot, a Michigan statute barring disposal of any solid waste that was not generated within the county in which the waste disposal facility was situated was declared invalid because of its "discriminating character," which impacted interstate commerce. In Chemical Waste, an Alabama statute that imposed a waste disposal fee on hazardous waste generated out of the state, but not on waste generated in the state was held to violate the principle of nondiscrimination inherent in the commerce clause. CT Page 1599
Although one may dispute the wisdom of these decisions, there is no basis for questioning their authority so far as this court is concerned. Moreover, this court cannot perceive any reasonable basis for doubting their applicability to the condition imposed on RESOL's permit that it must displace out-of-state waste in favor of waste from towns in this state. Since the issuance of the Fort Gratiot and Chemical Waste decisions, many state restrictions on importing out of state waste having a less obvious discriminatory character than this condition have been struck down as violations of the commerce clause. Government Suppliers Consolidating Serv. v. Bargh,975 F. 1267 (7th Cir. 1992); In re Southeast Arkansas Landfill, Inc., 981 F. 372 (8th Cir. 1992); Waste Systems Corp. v. County of Martin, Minn., 985 F. 1381 (8th Cir. 1983). This court is convinced, therefore, that the plaintiffs' appeals must be sustained because the commissioner's decision includes a condition violating the commerce clause of our federal constitution. General Statutes 4-182(j).
"If a particular agency action is required by law, the court, on sustaining the appeal may render a judgment that modifies the agency decision, orders the particular agency action, or orders the agency to take such action as may be necessary to effect the particular action." General Statutes 4-182(k). This provision applies only when a "particular agency action is required by law." Otherwise, a remand to the agency for further proceedings is necessary.
This court has concluded that the condition attached to RESOL's SWRRF permit is unlawful, but it does not follow that the "particular agency action" of issuing such a permit without that condition is required by law. The decision to issue the permit was inextricably intertwined with the final decision maker's assumption that the condition he imposed guaranteed that the waste from the HRRA towns would be disposed of at the Lisbon plant. On that basis he accepted the Wheelabrator contracts with the HRRA municipalities as sufficient compliance with22a-208d(c)(1)(D) for contracts evidencing that those municipalities "will send waste to the facility." His erroneous assumption may also have colored his determination of need. It is not possible for this court to decide whether the final decision maker would have CT Page 1600 deemed those contracts adequate or would have found a need for the Lisbon facility if he had realized that the condition he imposed was invalid. The court concludes, therefore that the case must be remanded to the agency for further proceedings.
It is ordered that judgment enter sustaining the appeal and that the case be remanded to the DEP for further proceedings.
David M. Shea State Trial Referee